488 A.2d 210

**Robert Anthony JACQUES, et ux.,**

**v.**

**The FIRST NATIONAL BANK OF MARYLAND.**

**No. 439, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Feb. 20, 1985.

Certiorari Granted June 28, 1985.

Albert D. Brault, Rockville (Janet S. Zigler and Brault, Graham, Scott & Brault, Rockville, on the brief), for appellants.

John E. Griffith, Jr., Baltimore (Piper & Marbury, Baltimore, on the brief), for appellee.

Argued before ROSALYN B. BELL, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

At the conclusion of all trial proceedings in a suit for damages, Robert Anthony Jacques and Margaret Ann Jacques, his wife, the appellants/cross-appellees (hereinafter "the Jacques") and The First National Bank of Maryland, the appellee/cross-appellant (hereinafter "First National")

have appealed from the judgment of the Circuit Court for Montgomery County entered on a jury verdict in favor of the Jacques against First National in the amount of $10,-000. First National contends that the trial court erred in failing to grant its motion for a directed verdict in its favor, and the Jacques contend that their damages were improperly limited by an erroneous jury instruction. Since we shall hold that First National's motion for a directed verdict should have been granted, we will not reach the Jacques' contention.

The dispute between the parties had its genesis on July 30, 1980 when the Jacques entered into a contract with Mr. and Mrs. Michael Clarke to buy a residence located at 629 Aster Boulevard, Rockville, Maryland, for $147,000. At the insistence of the sellers, an addendum was inserted in the standard realtor's contract of sale which provided:

Purchaser [the Jacques] agrees to increase the down payment to whatever amount is necessary to qualify for a mortgage loan. . . .

In the event lender approval is not obtained, this contract automatically will be null and void, and any deposit will be refunded in full. Should lender's approval be obtained, this contingency automatically shall be removed.

The Jacques' declaration revealed that the above language was added to the contract of sale in order to appease the sellers' concern that the contract would fall through if the Jacques could not find sufficient financing. The sellers' fears were grounded in the fact that a previous contract-buyer of their property had been unable to qualify for mortgage financing and had been unable to perform his undertaking.

The day following execution of the contract of sale, Mr. Jacques, an attorney in Rockville, Maryland, and his wife applied to First National for a residential mortgage loan in the amount of $112,000. They paid a $144 fee at the time of their application in order to cover the cost of an appraisal

and a credit report. On August 11, the bank sent a letter to the Jacques which stated in relevant part:

> The First National Bank of Maryland is pleased to have received your application for processing a Mortgage Loan. The required $144.00 fee for the appraisal and credit report to initiate processing does not constitute approval of your loan.

> The current rate for a loan of this type is 11–⅞%. This rate will hold for settlement for ninety (90) days from date the application is received in this office. At time of approval, the Bank will issue a commitment with a fixed interest rate, which will be binding upon written acknowledgement and acceptance. At the present time, processing and approval for this loan is approximately four weeks.

Thereafter, First National proceeded to collect the supporting documentation for the Jacques' loan. After First National received most of the supporting financial data, one of its mortgage officers determined that the Jacques' monthly income was insufficient for them to meet the payments on a $112,000 mortgage. Accordingly, the bank informed the Jacques that the highest amount the bank would lend them was $74,000 at 11⅞%, assuming that the Jacques could sell or rent their present residence. Prior to the Jacques' acceptance of this offer, the bank learned that the Jacques' home required renovation before it could be rented or sold and, therefore, decided that the bank would only loan $41,400 at the same interest rate.

Due to the fact that the bank would not lend the full amount requested, it informed Mr. Jacques of his right to seek alternative financing and provided Mr. Jacques with the documentation necessary for him to present a complete loan file to another institution. The Jacques then went to Metropolitan Federal Savings and Loan Association and obtained a commitment for a $100,000 mortgage, but at an interest rate two percent higher than that offered by First National.

Because of the limited amount of financing offered by First National and the higher interest rate demanded by Metropolitan, the Jacques then concluded that their purchase of the Aster Boulevard property was not quite the bargain they expected. Consequently, they then requested First National to refuse to loan them any money whatsoever so that they might attempt to utilize the financing contingency in their contract with the Clarkes and avoid their obligations under the contract altogether. First National refused to do so and, instead, sent the Jacques a commitment letter for a $41,400 loan at $11^7/_8\%$.

Notwithstanding the availability of the alternative financing from Metropolitan, the Jacques elected to accept First National's offer on September 16, 1983. They borrowed money from friends and relatives and used their extensive stock holdings to secure a personal loan of $50,000 in order to make up the difference between the mortgage loan and the price of the house.

Following the settlement on their purchase of the property, the Jacques filed a five count declaration against First National for (I) malicious interference with contractual relations, (II) breach of fidelity, (III) negligence, (IV) gross negligence, and (V) "prima facie" tort. The trial court directed a verdict against the Jacques after they presented their case on the count for breach of fidelity (Count II). The Jacques entered a voluntary dismissal on the count for "prima facie tort" (Count V). The remaining counts were submitted to the jury. The jury rendered a verdict for First National with regard to gross negligence and malicious interference with contractual relations (Counts I and IV) but returned a verdict in favor of the Jacques in the amount of $10,000 on the negligence count (Count III). Consequently, our review of the proceedings below will be limited to a determination of whether this jury verdict based on First National's negligence is supported by legally sufficient evidence.

For purposes of this appeal, we will presume that the jury had sufficient facts from which it could be determined that First National failed to exercise reasonable care in the processing of the Jacques' loan application.[1] Furthermore, we will presume that the Jacques proved that $10,000 in damages were proximately caused by First National's conduct. Consequently, the issue on which we focus is whether First National owed a duty to the Jacques to exercise reasonable care while processing the Jacques' application prior to the parties entering into a contractual relationship since, "in the absence of ... a duty, there can be no recovery in tort." *Wilmington Trust Co. v. Clark*, 289 Md. 313, 327, 424 A.2d 744 (1981) (husband owed no duty to ex-wife not to commit suicide and thereby reduce ex-wife's total alimony and support payments); *Peroti v. Williams*, 258 Md. 663, 669, 267 A.2d 114 (1970) (even if the negligence of the defendant as a matter of law exists, there is no liability unless the defendant breaches a duty to protect the plaintiff from injury); *Carlotta v. T.R. Stark & Assoc.*, 57 Md.App. 467, 470 A.2d 838 (1984) (land surveyor owed no duty to the adjoining landowners of his employer to use due care in surveying employer's land); *Furr v. Spring Grove State Hospital*, 53 Md.App. 474, 454 A.2d 414 (1983) (psychiatrist owed no duty to public at large to properly diagnose a dangerous patient); *Fisher v. O'Connor's, Inc.*, 53 Md.App. 338, 452 A.2d 1313 (1982) (bar owner owed no duty to intoxicated patron to refrain from selling him additional liquor); 2 Harper and James, *Law of Torts* 1015 (1956).

"Duty" in a negligence case has been defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Prosser and Keeton, *The Law of Torts* 356 (5th

---

1. The Jacques' theory of negligence was that First National failed to properly apply the guidelines for determining an applicant's "available income" that are usually and customarily applied by home mortgage lenders intending to resell those mortgages on the secondary mortgage market; specifically, the guidelines promulgated by the Federal Home Loan Mortgage Corporation, a/k/a "Freddie Mac."

ed. 1984). In the typical negligence action, "There is usually no occasion to discuss the question of duty because plaintiff is obviously within the scope of any test that is likely to be adopted." Harper & James, *supra,* at 1018. Nevertheless, the case *sub judice* is not a usual or obvious case. The Jacques have requested that this Court recognize a duty which has never before been recognized in Maryland; a duty which would run in direct conflict with the long established right of a person to refuse to do business with others, for nearly any reason or for no reason at all.

In *McCarter v. Chamber of Commerce,* 126 Md. 131, 136, 94 A. 541 (1915) the Court of Appeals, quoting from *Cooley on Torts* 278, stated: "It is a part of every man's legal rights, that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice." *See also Reeves v. State,* 447 U.S. 429, 438–39, 100 S.Ct. 2271, 2278, 65 L.Ed.2d 244 (1980). This principle was succinctly summarized in the first Restatement of Torts § 762 (1939): [2]

---

**2.** The Restatement (Second) of Torts did not include § 762 or any similar provision. However, the Reporter for the Restatement (Second) specifically explained that:

> The rules relating to liability for harm caused by unfair trade practices [including § 762] ] developed doctrinally from established principles in the law of Torts, and for this reason the decision was made that it was appropriate to include these legal areas in the Restatement of Torts.... In the more than 40 years since that decision was initially made, the influence of Tort law has continued to decrease, so that it is now largely of historical interest and the law of Unfair Competition and Trade Regulation is no more dependent upon Tort law than it is on many other general fields of the law and upon broad statutory developments, particularly at the federal level. The Council formally reached the decision that these chapters no longer belong in the Restatement of Torts, and they are omitted from this Second Restatement.

Therefore, the omission of § 762 in the Second Restatement is not an indication that the law has changed but is merely an indication that the law once called business torts is no longer deemed suitable for inclusion in a restatement of torts.

One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm if the refusal is not

(a) a breach of the actor's duty to the other arising from the nature of the actor's business or from a legislative enactment, or

(b) a means of accomplishing an illegal effect on competition, or

(c) part of a concerted refusal by a combination of persons of which he is a member.

The comment to § 762 states:

The rule stated in this Section rests upon fundamental assumptions in free business enterprise. Each business enterprise must be free to select its business relations in its own interest. Since it is always subject to actual or potential competition, it must choose well or suffer death. In the struggle of each enterprise for maximum returns, maximum supply is presumably assured. Denial of this privilege to select business relations would interfere, it is thought, with an important factor in the competitive process and might defeat its aim.

. . . . .

The privilege stated in this Section exists regardless of the actor's motive for refusing to enter business relations with the other and even though the sole motive is a desire to harm the other.

. . . . .

This Topic deals primarily with refusals to deal in the course of marketing goods or services. However, other situations are also within the scope of the rule stated in this Section. Thus the rule applies to refusals between manufacturer and distributor, between distributor and consumer, *between lender and borrower*, employer and employee, newspaper and advertiser, or between persons

seeking any other business transaction. The rule also applies to a refusal by either party (emphasis added).

The rule delineated in § 762 has been reaffirmed by the Maryland Court of Appeals in two relatively recent cases. In *Cunningham v. A.S. Abell Co.*, 264 Md. 649, 288 A.2d 157 (1972), The Court of Appeals refused to reverse the trial court's judgment n.o.v. for the defendant. There the defendant allegedly refused to continue a contract "at will" under which the plaintiff was employed to deliver defendant's newspapers to subscribers. The Court applying § 762 stated that: "regardless of motive one who causes intended or unintended harm to another merely by refusing to continue a business relationship terminable at will is not liable for that harm." *Id.* at 658, 288 A.2d 157. In *Grempler v. Multiple List. Bureau*, 258 Md. 419, 429, 266 A.2d 1 (1970) the Court assumed the applicability of § 762 and held that a real estate multiple listing bureau did not fall within any exception to § 762 when it refused to accept the membership of the plaintiff real estate brokerage. Although *Cunningham* and *Grempler* dealt with allegations of intentionally caused harm, we believe that, *a fortiori*, the rule and reasoning of § 762 and those cases should apply to a negligence action.

Subsections (a)–(c) of § 762 recognize several limitations on a person's freedom to select those with whom he will enter into contractual relations. In short, these limitations are founded upon the law dealing with public utilities, common carriers, civil rights, antitrust violations, malicious interference with contractual relations and conspiracy to interfere with contractual relations. The Jacques have not urged the applicability of any of these limitations except to argue that a residential mortgage lender ought to be treated like a public utility. Prosser & Keeton summarized the public utility exception as follows:

> *Public Utility Services and Other Services Required by Law.* There are, however, a few situations in which failure to perform a contract may amount to a tort. One notable instance is the survival of the old tort duty to

serve all comers which arose as to common callings before the idea of contract had developed. Under modern law this duty to serve exists only as to public officers, common carriers, innkeepers, public warehousemen, and public utilities, who become liable in tort for nonperformance of their contracts, or even for refusal to enter into a contract at all. No such obligation rests today upon ordinary citizens engaged in other activities; and in the absence of legislation a physician, a restaurant or a racetrack will not be liable for turning people away, for any reason or none. This is subject to the qualification that civil rights statutes, prohibiting under criminal penalty discrimination against any person on the ground of race or color, are commonly interpreted as intended to provide a tort action as a remedy.[3]

We find no support in the case law or in reason to treat privately owned mortgage lenders the same as public utilities. Although they are highly regulated, mortgage lenders have never been granted a monopoly and, in fact, are subject to intense competition. We therefore decline to impose a duty upon the lenders of residential mortgage money to use due care in evaluating an application for a mortgage loan. Whether the application is granted and the amount which the lender is willing to risk on the applicant are matters which heretofore have been beyond judicial scrutiny, absent some violation of the applicant's constitutionally guaranteed civil rights. We are not persuaded that such a rule should be judicially abrogated.

Our review of the decisions of our sister jurisdictions supports the propriety of our holding. In *Wagner v. Benson,* 101 Cal.App.3d 27, 161 Cal.Rptr. 516 (1980) the California Court of Appeal held that a bank does not owe a duty to

---

**3.** Prosser & Keeton, *supra* at 662 (footnotes omitted). See also *Silbert v. Ramsey,* 301 Md. 96, 482 A.2d 147 (1984) (affirming the right a race track to exclude a potential patron on the basis of a prior criminal conviction—and reaffirming the long-standing common law right of a proprietor to exclude potential patrons without reason so long as the exclusion is not based on race, creed, color or national origin).

exercise care in approving an application for a loan. Therefore, the borrowers could not recover from the bank for their own bad business deal which the bank did not prevent by carelessly not refusing to lend the money. In *Washington Steel Corp. v. TW Corporation*, 602 F.2d 594 (1979) the Third Circuit Court of Appeals held that a bank had no duty to refrain from loaning money which would be used to acquire one of the bank's other customers in a hostile tender offer. Although factually distinguishable from the case *sub judice, Washington Steel Corp.* strongly suggests that the imposition of additional duties upon banks is a legislative, not judicial, task. In *John Deere v. Short*, 378 S.W.2d 496, 502–03 (1964), a farm equipment dealer sued the equipment manufacturer for damages arising out of the manufacturer's failure to extend various loans the dealer expected when it opened for business. The Supreme Court of Missouri held that a manufacturer had no non-contractual duty to make the loans to the dealer since their relationship was purely contractual. In *Farabee-Treadwell Co. v. Union & Planters' Bank*, 135 Tenn. 208, 186 S.W. 92 (1916) a bank refused to make a loan to a depositor and, in fact, ordered the depositor to close its account with the bank. The Tennessee Supreme Court held that the bank owed no duty in tort to extend a loan or to continue an account with a customer. Any relief for the customer would arise out of a contractual duty or not at all.

In their brief, the Jacques rely heavily upon *First Federal S. & L. v. Caudle*, 425 So.2d 1050 (Ala.1983) in which the Supreme Court of Alabama upheld a jury verdict in favor of two loan applicants against a bank. *Caudle*, however, is distinguishable from the case at hand and has recently been given a narrow interpretation by the deciding court in *Brasher v. First Alabama Real Estate, Fin.*, 447 So.2d 682 (Ala.1984). In *Caudle*, the defendant bank had agreed to process a Federal Housing Administration loan for the appellants. The bank was to receive a one percent loan origination fee for making the loan in addition to receiving the benefit of making a government subsidized loan at the

prevailing mortgage interest rate. The court held that, although the bank was under no duty to help procure the F.H.A. loan, once it voluntarily agreed to assist the Caudles, it was required to act with due care. In that case, the bank negligently and mistakenly informed the Caudles that their loan had been approved.

In the instant case, First National never agreed to lend the Jacques more than $41,000 for 30 years at 11⅞% interest rate. Whether it used good business judgment in failing to do so is a question for which it may have to answer in the competitive market in which it does business. In our view, however, it was under no obligation to conform its business judgment to any recognized standard of care.

JUDGMENT AGAINST THE FIRST NATIONAL BANK OF MARYLAND, APPELLEE AND CROSS-APPELLANT, REVERSED;

APPELLANTS AND CROSS-APPELLEES TO PAY COSTS.

ROSALYN B. BELL, Judge, concurring.

The opinion on this case holds that a bank owes no duty of care to a consumer in deciding whether to grant or refuse a loan application. I concur in the result limited to the facts of this case, although not necessarily in the holding espoused by the opinion. I do not agree that the case law cited to support the lack of duty precludes entirely the possibility of finding such an obligation in an appropriate case. We do not have a special verdict here, so we do not know what the jury concluded the negligent act or acts of the bank were. There is a thin line between common law negligence and intentional wrongs. While they are not necessarily and always repugnant, we note that the allegations in this case sound in intentional tort and not in negligence.

Additionally, I concur in the result because Maryland law does not recognize an action for breach of fidelity by a bank, but neither party raises that issue on appeal. I

respectfully suggest that a cause of action for breach of fidelity should exist in Maryland. *First Federal Savings & Loan Association v. Caudle,* 425 So.2d 1050 (Ala.1982), in which the Supreme Court of Alabama held that a bank owed a duty of care to its customer, supports this position. In that case, First Federal agreed to aid the Caudles in obtaining a federal loan to build a house. Because they could not afford the building costs without the loan, the Caudles instructed the builders "to delay construction until the loan was approved." *Id.* at 1051. A bank employee finally informed them that the loan was approved, and the Caudles proceeded to build their house. Only after completion did they learn that the loan, in fact, had been denied. *Id.* The Alabama court held that, once the bank voluntarily agreed to help the Caudles obtain a loan, it had a duty to act with due care. In further emphasis of this duty, the court pointed out that there was evidence in the case from which "the jury could have concluded that the Caudles' desire to build a home was predicated on their receiving a low interest loan which they could afford." *Id.* at 1052.

Similarly, the Jacques sought a low interest loan for two reasons: (1) the contingency in their agreement with the seller required a mortgage with a specified interest rate; and (2) the contingency provided that the Jacques would increase their down-payment to qualify for a loan. Their purchase of the house, therefore, depended on obtaining a large enough loan to keep the down-payment affordable and within the specified range of interest rates. The bank's approval of such a small loan forced the Jacques to choose between breaching their purchase agreement or obtaining a larger loan with an interest rate two percent higher.

There was evidence submitted to the jury which would have supported an inference that the bank did not exercise good faith in evaluating the Jacques' request for a loan. At trial, the loan officer testified that at the time the Jacques' filed their application, in August of 1980, the bank was trying to limit the extension of low rate loans. It did this because the bank resold many of its loans and sought to

take advantage of the increasing interest rates. The officer further related that when considering the Jacques' request, the bank failed to follow the guidelines published by the Federal Home Loan Mortgage Corporation despite its ordinary adherence to those standards. For example:

(1) The loan officer averaged only two years of the Jacques' income. Bank practice usually involved an evaluation of the applicant's tax returns for the preceding three years. In addition, the officer knew that due to illness the Jacques' income for the two years was lower than usual and, therefore, distorted their financial status.

(2) Payments on the Jacques' current home were erroneously included in the calculation. The bank typically reviewed only unsecured consumer debts, as provided by the guidelines.

(3) Income from stock was not considered at all. Its inclusion would have bolstered the strength of the Jacques' income.

Furthermore, the loan officer admitted that he did not consider alternate factors, such as good credit history or substantial net worth.

The bank's failure to act in good faith when evaluating the Jacques' financial status, if believed, could have resulted in an injury that would not have occurred if the bank followed its standard practice and refused the loan outright. Rather than denying the loan, the bank acted in bad faith in approving it. By imposing a duty of care on a bank, consumers would be protected from such procedures.

ROBERT M. BELL, Judge, dissenting.

The Jacques applied for a loan of $112,000 with First National and paid the processing fee of $144. Shortly thereafter, they submitted a copy of the contract of sale for the home for which they sought the mortgage loan. Information required by the bank concerning their income, credit history, and financial status, was then supplied. They were first told that the maximum loan for which they qualified

was $74,000, an amount Mr. Jacques indicated he would accept[1] and subsequently, that the amount was $41,400.

The Jacques sought alternative financing. They obtained a commitment from another bank for a loan of $100,000, but at an interest rate two percent higher than that quoted by First National.[2] That loan was not accepted because of the economics of the situation;[3] it would have cost over the life of the loan, over $50,000. Despite the Jacques' request that it refuse the loan, First National issued its loan commitment for $41,400.

Being concerned about the forfeiture of their deposit of $10,000, the Jacques accepted First National's loan and went to settlement. Part of the more than $100,000 due at settlement was provided by a personal loan, made by First National, in the amount of $50,000 at 15 percent interest.

At trial, evidence, including expert testimony, was produced tending to show that the bank departed from the Federal Home Loan Mortgage Corporation guidelines, the industry standard for determining qualification for home mortgage loans, in that First National incorrectly calculated the Jacques' income to debt ratio. The evidence also tended to show that the house purchased by the Jacques was appraised for $142,000; that First National calculated the Jacques' net worth at $350,000; and that the Jacques had maintained a debt-free credit history for over twenty years. In addition, the evidence showed that the Jacques had dividend income of approximately $7500 per year which

---

1. There is dispute on this point, First National contending that the $74,000 figure was contingent upon the Jacques selling or renting their present residence and that the figure was revised prior to acceptance by the Jacques.

2. During the time that the bank was processing the Jacques' mortgage loan, the interest rate rose at a rapid rate until it reached a point at which interest rates were a full two percent higher than the rate originally quoted by First National.

3. The Jacques were not obligated to accept this loan inasmuch as their contract with the sellers required them to accept a loan only if the interest rate was less than 12.25 percent.

First National did not use in its evaluation of the strength of their "income stream". Finally, there was evidence that it was normal banking procedure to inquire of a loan applicant his or her wishes when a loan could not be made in the amount requested. First National made no such inquiries and did not investigate the effect that refusing the loan application would have on the Jacques' contract.

Today, we hold that a bank is under no obligation to conform its business judgment to any standard of care in the processing of a loan application prior to the establishment of a contractual relationship with the applicant. Relying on the principle that "it is a part of every man's legal rights, that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice", *McCarter v. Chamber of Commerce*, 126 Md. 131, 136, 94 A. 541 (1915) and in finding that a bank is to be treated the same as any other business, the majority holds that a bank has the right to act, with impunity, in a completely arbitrary manner with respect to a loan application.

I dissent. I would affirm the judgment below. First, accepting the majority's premise, I have concluded that First National gratuitously undertook to render a service and, thereby, was obligated to proceed with due care. Additionally, I would hold that, under the facts of this case, First National had a duty to act with due care, both in the processing of the loan application and in the communication of its decision and that there was sufficient evidence from which the jury could find, as it did, negligence on the part of the bank on either, or both, of these grounds.

Maryland has recognized that: "... one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all". *Kemp v. Armstrong*, 40 Md.App. 542, 546, 392 A.2d 1161 (1978), quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275,

276, 23 A.L.R. 1425 (1922). See *Pennsylvania R. Co. v. Yingling*, 148 Md. 169, 129 A. 36 (1925). This principle has been held to impose upon an employer the responsibility of acting carefully when it undertakes to compile and maintain personnel records, *Quinones v. U.S.*, 492 F.2d 1269 (3rd Cir., 1974), to require insurance companies to exercise due care in processing insurance applications, *United States Fire Insurance Company v. Cannon*, 349 F.2d 941 (8th Cir.1965), *Travelers Insurance Company v. Anderson*, 210 F.Supp. 735 (W.D., S.C.1962)[4] and to require a bank to act reasonably when assisting an applicant for a loan. *The First Federal Savings and Loan Association of Hamilton v. Caudle*, 425 So.2d 1050 (S.Ct., Ala.1982). The principle has also been recognized and codified in the Restatement, Torts 2d, § 323.[5]

In *Caudle*, a bank, although it had no obligation to do so, undertook to assist applicants for an FHA loan in its processing. It erroneously informed the applicants that the loan had been approved and the applicants, relying upon that information, caused their home to be built. It was later determined that the FHA loan had never been approved and the applicants sued the bank. In upholding the

---

**4.** The court in *Travelers Insurance Company v. Anderson,* supra, recognized that the insurance business is affected by the public interest. So too are banks; they are highly regulated, both by the state and by the federal government and, when authorized, are bound, like insurance companies, to furnish the services so authorized.

**5.** Section 323 provides:
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.
> Although the harm referred to is "physical harm", by analogy, I find this provision persuasive.

jury verdict in favor of the applicants, the Supreme Court of Alabama said:

> Although First Federal was under no duty to procure a federal subsidized loan for the Caudles, once it voluntarily agreed to assist the Caudles, it was required to act with due care. (Citations omitted)

id. at 1052.

In the instant case, First National undertook to process the Jacques' application for a mortgage loan of the type it usually and customarily made. It obtained, through frequent communications with the Jacques, the information necessary to process the application. Having assumed to process the application, First National was required to proceed with due care. This it did not do.

The majority suggests that the decision in *Brasher v. First Alabama Real Estate Fin.*, 447 So.2d 682 (S.Ct.Ala. 1984) narrowed the scope of *Caudle*. I disagree. Addressing the allegations based upon *Caudle*, the Court stated:

> In the instant case, the Brashers admitted, while being deposed, that there was never any oral or written guarantee by Flowers on behalf of Charter to obtain long-term mortgage financing for their house. Despite the lack of a written or verbal guarantee, Charter or its agents, attempted, in good faith, to obtain financing for the Brashers' house from several sources, but were unsuccessful. There is no evidence in the record to suggest that Charter or its agents did not put forth their best efforts to obtain the financing that the appellants desired. Indeed, the facts indicate that because of the existing economic conditions, funds for long-term mortgages were scarce.

id. at 685.

Thus the decision in Brasher turned on two points: first, the bank did not undertake to guarantee financing, and, secondly, there was no showing that the bank negligently performed the acts it voluntarily undertook. This is entirely consistent with *Caudle*.

Applying the rationale of *Caudle* to the case *sub judice*, I would affirm.

When the Jacques tendered, and the bank accepted, the mortgage loan application, a business relationship was established.[6] Acceptance of the application for processing clearly indicated the bank's willingness to "deal" with the Jacques and gave rise to mutual expectations. First National expected the Jacques to supply accurate information in a timely fashion. The Jacques expected that the information supplied would be fairly, accurately, and objectively evaluated. Both had ultimate expectations as well: First National to realize the profits normally associated with loans of this kind and the Jacques, to obtain a loan at the interest rate committed. These expectations, in turn, gave rise to mutual duties—to act reasonably in their dealings with each other.[7] The jury apparently found that the Jacques complied and that First National did not. I would not disturb that finding.

First National was fully aware of the nature of the Jacques' contractual undertaking and the consequences, to the Jacques, if it committed to a loan of insignificant amount in comparison to the loan sought. It likewise is charged with knowledge of normal banking procedures with respect to mortgage loans. Thus, it was aware that when a

---

6. If the bank had refused to accept the application, this case would not be here, or, if it were, the cases cited by the majority would clearly apply. Here, First National, rather than refusing to do business, insisted upon doing business, even to the point of forcing the applicants to do likewise. This situation is not contemplated or dealt with in the cases cited by the majority.

7. Contrary to the majority's implied suggestion, the application process does not benefit only the applicant or only the bank; it involves mutual benefits. The possibility of the realization of a benefit flowing from the process distinguishes the acceptance and processing of an application from a mere refusal to do business. In processing applications, a bank does business; after all, part of the bank's business is making loans. A loan cannot reasonably be made without willing customers, willing banks, reliable information and a procedure by which a decision can be made.

bank is unable to make a loan for the amount requested, it should inquire of the applicant, his or her wishes. Its failure to do so, under the circumstances of this case, was negligence.