515 A.2d 756

Robert Anthony JACQUES et ux.

v.

The FIRST NATIONAL BANK OF MARYLAND.

No. 66, Sept. Term, 1985.

Court of Appeals of Maryland.

Oct. 8, 1986.

Albert D. Brault (Janet S. Zigler and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellant.

John E. Griffith, Jr. (Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RO-DOWSKY, COUCH and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

McAULIFFE, Judge.

This appeal presents the issue of whether a bank that has agreed to process an application for a loan owes to its customer a duty of reasonable care in the processing and determination of that application. We hold that under the particular facts of this case the bank is properly charged with that duty.

The bank customers, Robert and Margaret Jacques ("the Jacques"), sued The First National Bank of Maryland ("the Bank") alleging that the Bank failed to properly evaluate their qualifications for a home mortgage loan. The Jacques' complaint was in five counts, claiming malicious interference with the right of contract, breach of fidelity, negligence, gross negligence, and "prima facie" tort.

I

This dispute began with a residential sales contract executed on July 30, 1980 between Michael and Kathleen Clarke as sellers and the Jacques as purchasers. The purchase price fixed by the contract was $142,000.00. The Jacques were to pay $30,000.00 cash, referred to by the parties as a down payment, and obtain the balance of the purchase price through outside financing. The printed

form of the contract required that the Jacques secure the balance of $112,000.00 through a conventional deed of trust, due in thirty years and bearing interest at the rate of 12–$\frac{1}{4}$ % per annum. The contract was expressly contingent upon the Jacques ability to obtain this financing. By a handwritten addendum, however, the parties agreed to the following significant modification of the financing and contingency provisions:

> Purchaser agrees to increase the down payment to whatever amount is necessary to qualify for a mortgage loan.

The addendum also provided for an acceptable alternative financing rate of 11–$\frac{7}{8}$% with payment of two points [1] by the purchasers.

Shortly after the execution of the contract, the Jacques submitted their application to the Bank seeking a loan in accordance with the terms of the contract. A copy of the contract, including the addendum, was submitted with the application. On August 11, the Bank sent a letter to the Jacques stating:

> The First National Bank of Maryland is pleased to have received your application for processing a Mortgage Loan. The required $144.00 fee for the appraisal and credit report to initiate processing does not constitute approval of your loan.
>
> The current rate for a loan of this type is 11–$\frac{7}{8}$%. This rate will hold for settlement for ninety (90) days from date the application is received in this office. At time of approval, the Bank will issue a commitment with a fixed interest rate, which will be binding upon written acknowledgement and acceptance. At the present time, the processing and approval for this loan is approximately four weeks.

---

1. The term "two points" refers to a one time payment of two percent of the amount of the loan.

On September 1, a bank officer contacted the Jacques and informed them they qualified only for a loan of $74,000.00. Subsequently, the Bank informed the Jacques that it had erred in its original determination of eligibility, and that in fact, under the Bank's guidelines, the Jacques qualified for a loan of no more than $41,400.00. The Jacques vigorously protested this determination, but to no avail. They then requested that the Bank issue an outright refusal of their loan application. The Bank declined this request, explaining that the application, read in light of the contract, was for the maximum loan for which the applicants would qualify, and the Bank had determined that the Jacques qualified for a loan of $41,400.00.

The Jacques promptly attempted to obtain financing from another lending institution, Metropolitan Federal Savings and Loan Association. On the strength of the same information that had been provided the Bank, Metropolitan issued its commitment for a thirty-year loan in the amount of $100,000.00. However, because interest rates had dramatically escalated shortly after the Jacques had submitted their original application to the Bank, the proposed rate of interest on the Metropolitan loan was 13-7/8%. Concluding that the additional two percent interest would cost them more than $50,000.00 over the life of the loan, and because their contract did not require them to accept financing that exceeded 12-1/4% interest, the Jacques did not accept the Metropolitan loan. Instead, they proceeded to settlement with the Bank's $41,400.00 loan, securing personal loans from relatives and a short term personal loan of $50,000.00 from the Bank. In order to obtain the personal loan from the Bank, the Jacques were required to pledge their personal stock portfolio as security and to pay 15% interest on that loan.

On January 28, 1982, the Jacques filed suit against the Bank. Following six days of trial, the case was submitted to the jury on the claims of malicious interference with

contract, gross negligence, and negligence.[2] The jury returned a verdict in favor of the Bank on the claims of malicious interference with contract and gross negligence, but found in favor of the Jacques on the negligence count and awarded them $10,000.00 compensatory damages. The Jacques appealed, contending the trial judge had erred in instructing the jury concerning the plaintiffs' duty to minimize their damages.[3] The Bank cross-appealed, arguing that as a matter of law it owed no duty to the Jacques in the processing of the loan application, and therefore its motion for a directed verdict should have been granted. The Court of Special Appeals reversed the trial court, holding that the Bank had no duty to use due care in evaluating the Jacques' application for a loan. *Jacques v. First National Bank,* 62 Md.App. 54, 488 A.2d 210 (1985). We granted certiorari to determine whether a bank does owe a duty to its customer under the circumstances presented by this case. We reverse.

## II

To establish a cause of action in negligence a plaintiff must prove the existence of four elements: a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages. *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 712, 501 A.2d 35 (1985); *Scott v. Watson,* 278 Md. 160, 165,

---

**2.** The trial judge granted the Bank's motion for a directed verdict on the breach of fidelity count, and the Jacques voluntarily dismissed their claim of "prima facie" tort.

**3.** The Jacques contend that under the circumstances of this case an instruction on the duty to minimize damages was error and that it permitted the Bank to argue, and the jury to find, that the Jacques had the option of forfeiting their $10,000.00 deposit with the Clarkes and that their damage, if any, should therefore be limited to that amount. This issue was not considered by the Court of Special Appeals because of its finding that no duty existed on the part of the Bank, and was not included within the questions brought to this Court by writ of certiorari.

359 A.2d 548 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114 (1970). Absent a duty of care there can be no liability in negligence. *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078 (1986); *Read Drug & Chem. Co. of Balto. City v. Colwill Constr. Co.,* 250 Md. 406, 243 A.2d 548 (1968); *Leonard v. Lee,* 191 Md. 426, 62 A.2d 259 (1948); *Pennsylvania R. Co. v. State,* 188 Md. 646, 53 A.2d 562 (1947); *W. Va. Central R. Co. v. Fuller,* 96 Md. 652, 666, 54 A. 669 (1903). *See also Inmi-Etti v. Aluisi,* 63 Md.App. 293, 492 A.2d 917 (1985).

The duty element in a negligence action is "an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another." J. Dooley, *Modern Tort Law,* § 3.03, at 18–19 (1982, 1985 Cum.Supp.). The history of the concept of duty is traced in *Prosser and Keeton on The Law of Torts,* § 53, at 357 (1984):

> [W]hen negligence began to take form as a separate basis of tort liability, the courts developed the idea of duty, as a matter of some specific relation between the plaintiff and the defendant, without which there could be no liability. We owe this to three English cases, decided between 1837 and 1842. [*Winterbottom v. Wright,* 10 M. & W. 109, 152 Eng.Rep. 402 (1842); *Langridge v. Levy,* 2 M. & W. 519, 150 Eng.Rep. 863 (1836), *aff'd,* 4 M. & W. 337, 150 Eng.Rep. 1458 (1838); *Vaughan v. Menlove,* 3 Bing.N.C. 468, 132 Eng.Rep. 490 (1837).] The rule which developed out of them was that no action could be founded upon the breach of a duty owed only to some person other than the plaintiff. He must bring himself within the scope of a definite legal obligation, so that it might be regarded as personal to him. "Negligence in the air, so to speak, will not do."
>
> * * * * * *
>
> The statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. It is therefore not surprising to find that the

problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of a conclusion, rather than an aid to analysis in itself. Yet it is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendant's responsibility may be limited, has been devised. But it should be recognized that "duty" is . . . an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. (Footnotes omitted.)

Similarly, in 3 F. Harper, F. James, & O. Gray, *The Law of Torts*, § 18.1, at 652 (2d ed. 1986), the development of the concept of duty in relation to negligence is set forth:

The law of negligence started from the notion that negligence was one way to fail in the performance of a determinable legal duty, so that the courts came quite naturally to look on negligence as the correlative of a duty not to harm plaintiff in the manner of which he was complaining. This duty might arise from the public nature of defendant's calling, from his holding of a public office, from bailment, from prescription or custom, or from his control of a dangerous thing. It might also arise from private contract. It appeared "as a sort of parasitic obligation in connection with an actual contract or obligation." Later the common law concept of negligence was extended to make persons liable for damages from the negligent performance of their own projects and undertakings, quite apart from calling, office, contract, or the like. And in time negligence came to be thought of as an independent ground of liability. But the habit of thought which more or less unconsciously made negligence correlative to an antecedent duty to use care persisted. . . . (Footnotes omitted.)

The duty with which we are here concerned is a duty imposed by law as a matter of sound policy, for the violation of which a person may be held to respond in damages in tort. This duty is conveniently, if not lyrically, referred

to as a "tort duty." A tort duty does not always coexist with a moral duty. *Prosser and Keeton, supra*, § 56, at 375. Neither must a duty imposed by statute necessarily create a tort duty. *Merrell Dow Pharmaceuticals v. Thompson*, —— U.S. ——, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Murphy v. Baltimore Gas & Elec.*, 290 Md. 186, 428 A.2d 459 (1981). Nor does a duty assumed or implied in contract by that fact alone become a tort duty.

> The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort. *Heckrotte v. Riddle*, 224 Md. 591, 595, 168 A.2d 879 (1961).

Still, while every contractual duty does not also impose a tort duty,

> [w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract. *Slacum v. Trust Co.*, 163 Md. 350, 352–53, 163 A. 119 (1932) (quoting 26 R.C.L. 986).

In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.[4] This intimate nexus is satisfied

---

**4.** An increasing number of courts have declined to consider the nature of the risk of harm as a factor in determining the existence of a tort duty, finding no rational basis to distinguish between a risk of personal injury and a risk of economic loss. *See, e.g., Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041 (Colo.1983); *Drexel Properties, Inc. v. Bay*

by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability. *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). *See also Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986) and *Scott v. Watson*, 278 Md. 160, 359 A.2d 548 (1976).

Because the harm likely to result from negligent processing of a loan application is limited to economic loss, we examine carefully the relationship that existed between these parties.

> [T]ort obligations of conduct are imposed by reason of the relation in which the parties stand toward one another; and in determining that relation, the law will often take into account what has been agreed between them, either to increase the actor's responsibility or to lessen it, so that the tort duty finally fixed may coincide with that set by a contract, and for its breach either a contract or a tort action will lie. *Prosser and Keeton, supra,* § 1, at 5.

Two early leading decisions considering claims of the existence of tort duties in economic loss cases illustrate the importance of the nature of the legal relationship existing between the parties. In *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), the Court of Appeals of New York held that a public weigher of beans was liable to the buyer of the beans for negligence in the weighing, notwithstanding that the weigher had been engaged and paid only by the seller. The New York court, speaking through Judge Cardozo, held that the buyer, although having no contract with the weigher, was the known and intended beneficiary of the contract

---

*Colony Club Condominium, Inc.*, 406 So.2d 515 (Fla. 4th Dist.Ct.App. 1981); *Barnes v. Mac Brown and Company*, 264 Ind. 227, 342 N.E.2d 619 (1976); *Juliano v. Gaston*, 187 N.J.Super. 491, 455 A.2d 523 (1982), *cert. denied*, 93 N.J. 318, 460 A.2d 709 (1983); *Quail Hollow East Condominium Association v. Donald J. Scholz Co.*, 47 N.C.App. 518, 268 S.E.2d 12, *review denied*, 301 N.C. 527, 273 S.E.2d 254 (1980); *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768 (1980).

between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher. The court further concluded that as a public weigher holding itself out as skilled and careful in its calling, the defendant's "assumption of the task of weighing was the assumption of a duty to weigh carefully for the benefit of all whose conduct was to be governed" thereby. *Id.* at 276. Given the nature of the contract and the relation between the parties, the duty was one imposed by law as well as assumed by contract.

In *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), the same court held that public accountants who carelessly prepared and certified a balance sheet for a corporation could not be held liable in negligence to a factor who made loans to the corporation in reliance upon the balance sheet. While noting that the accountants were generally on notice that the balance sheet was likely to be relied upon by others, the court distinguished this case from *Glanzer* on the basis that there was no "contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants ... to the indeterminate class of persons who ... might deal with the [corporation] in reliance on the audit." *Ultramares, supra,* at 446. In the absence of the intimate nexus found in *Glanzer*, the *Ultramares* court concluded that the accountants might be liable to the factor for deceit, but not for negligence alone.

> [I]f there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made.

*Id.* at 448.

Significant in both of these cases is the fact that the court had no difficulty in finding that the actors under each contract owed a tort duty of due care to the parties with whom they had contractual privity or its legal equivalent. *See Ultramares, supra,* 174 N.E. at 444; *Glanzer, supra,* 135 N.E. at 275.

We discern from our review of the development of the law of tort duty that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent.

### III

In the present case there is no claim that the Jacques were strangers to the transaction. Instead, the Bank contends that there was no contract, and therefore no legal relationship between it and the Jacques at the time of the Bank's alleged negligence. We disagree. The Bank made at least two express promises to the Jacques. It agreed first to process their loan application and second to "lock in" the interest rate of 11-7/8% for a period of ninety days. If these promises were supported by a valid consideration they were enforceable. We conclude they were.

First, we observe that the Bank agreed to process the loan application only if the Jacques paid the sum of $144.00 for the appraisal and credit report. The Bank contends that it received no consideration as a result of this payment because it passed on the money to others. We are not persuaded by this argument, for it is basic contract law that consideration supporting a promise "may be given to a promisor or to some other person" and it "may be given by the promisee or by some other person." *Queen City v. Independent,* 230 Md. 387, 392, 187 A.2d 459 (1963) (citing *Humbird v. Humbird,* 162 Md. 582, 586, 160 A. 623 (1932)). Additionally, we conclude that this initial agreement to process the loan application was intended to, and did, result

in a business advantage to the Bank. In the competitive business of seeking out borrowers for the purpose of making loans that would bring a profit to it, the Bank offered an inducement in the form of a guaranteed interest rate for ninety days. When the Jacques accepted that offer by paying the required fee and submitting the loan application documents, the Bank obtained a business advantage and potential benefits sufficient to support its promise. *See Swift v. Allan,* 211 Md. 588, 595–96, 128 A.2d 260 (1957).

The inducement of a guaranteed rate of interest for a period of ninety days, especially in a time of fluctuating interest rates, clearly is intended to entice the customer to deal with the offering bank rather than with some other lender. Although the customer does not covenant that he will refrain from simultaneously making application with other lenders, we think the practicalities of the home loan market, and particularly the expense of each application, have the effect of at least temporarily taking the customer out of the market. As a greater number of loan applications may be expected to result in a greater number of loans, and thus a greater profit, the business advantage to the bank is real even though every application will not lead to a profit.

In *Magness v. Trust Co.,* 176 Md. 528, 6 A.2d 241 (1939), this Court considered a tort claim of wrongful dishonor of checks brought by a bank's customer. Noting that a contract is ordinarily implied between the bank and its depositors, our predecessors discussed the duties arising from the contract as being those enforceable by an action in tort, and made no distinction between the two types of duties. *See also Siegman v. Equitable Trust Co.,* 267 Md. 309, 297 A.2d 758 (1972).

The case before us is factually distinguishable from those in which a prospective customer simply submits an application for a loan, or for insurance, and thereafter claims that the unilateral act of submitting the application gives rise to a duty on the part of the recipient to act upon it without

delay. The courts have generally held in those instances that the bank or insurance company has not undertaken to process the application, and therefore has no duty to do promptly that which it has no duty to do at all. *See, e.g., Patten v. Continental Cas. Co.,* 162 Ohio St. 18, 120 N.E.2d 441 (1954); *Zayc v. John Hancock Mut. Life Ins. Co.,* 338 Pa. 426, 13 A.2d 34 (1940). *See also* W. Prosser, *Delay In Acting On An Application For Insurance,* 3 U.Chi.L.Rev. 39 (1935); Note, *Application For Insurance,* 36 Temple L.Q. 84 (1962). *But see United States Fire Insurance Co. v. Cannon,* 349 F.2d 941 (8th Cir.1965) (applying Nebraska law); *Travelers Insurance Company v. Anderson,* 210 F.Supp. 735 (W.D.S.C.1962) (applying South Carolina law); *Duffie v. Bankers' Life Ass'n of Des Moines,* 160 Iowa 19, 139 N.W. 1087 (1913) 46 L.R.A. (N.S. 25).

We recently reaffirmed the common law rule that ordinarily a proprietor may refuse to do business with a person for any reason except race, color, creed, or national origin. *Silbert v. Ramsey,* 301 Md. 96, 482 A.2d 147 (1984). Assuming *arguendo* that a chartered bank is not subject to an exception to the general rule, the Bank could have refused to do business with the Jacques. Here, however, the Bank expressly undertook to process the application, advised its customer of the probable time required for processing, guaranteed a specified rate of interest for a period of ninety days for any loan for which the Jacques might qualify, and entered upon performance.[5] That the Bank could have declined to consider the Jacques' application is of no consequence where the facts show the Bank made a decision to the contrary.

---

5. There is authority for providing redress for economic loss caused by the breach of a gratuitous promise, where performance has been undertaken. *Prosser and Keeton on Torts, supra,* § 56 at 379–82. In view of our determination that a contract existed under the facts of this case, we need not consider whether "good samaritan" principles generally applicable in cases involving risk of personal injury are applicable in cases involving only a risk of economic loss.

The Bank suggests that an undertaking to process a loan application should not give rise to a duty to use due care in the processing and determination of that application. A similar contention was raised by a bank in *Magness v. Equitable Trust Co., supra.* There, in a tort action for wrongful dishonor of checks, a customer who consistently "covered" his checks with deposits made on the same day claimed the bank was aware of his practice and had agreed to search the daily deposits before dishonoring a check. The bank, in addition to contending that it had made no such agreement, argued that "if there was an undertaking to search for the deposits, it would not be an undertaking to find the deposits if there...." Rejecting that contention, this Court said that "[a]n agreement to search among the deposits in the company's possession seems to mean an agreement to find them."

■ Analogously, in the case before us, implicit in the undertaking of the Bank to process the loan application is the agreement to do so with reasonable care. Having therefore found that a contract was created between the parties, and that this contract included an implied promise to use reasonable care, we turn to the final consideration of whether a concomitant tort duty should be recognized under these circumstances.

Examining further the relationship that existed between these parties, we note that the rather extraordinary financing provisions contained in the real estate sales contract, and thereby integrated into the loan application, left the Jacques particularly vulnerable and dependent upon the Bank's exercise of due care. The Jacques, while indicating that they would request a loan of $112,000.00, were required by contract to proceed to settlement with whatever loan they could obtain at the agreed rate of interest. Therefore, when the Bank agreed to process the application for a loan and agreed to determine the amount of the loan for which the applicants qualified, it undertook a significant responsibility. In accepting the loan application for pro-

cessing, the Bank had knowledge that the Jacques would be legally obligated to either proceed to settlement with the loan determined by the Bank or forfeit their deposit of $10,000.00 and lose any benefit of their bargain. Of course, ordinarily the Jacques would have had the additional option of seeking alternative financing after the Bank apprised them of the amount for which it considered them qualified. However, in view of the dramatic increase in the prime rate of interest that had occurred while this loan was being processed and the limited time available to the Jacques under the contract to obtain financing,[6] successful resort to this alternative appeared doubtful.

The Bank was well aware of the nature of its obligation. When the Jacques requested that the Bank disapprove their application in its entirety if it would lend them no more than $41,400.00, the Bank adamantly, and correctly, refused the request, noting that it was obliged by the terms of the application and contract to offer a commitment in an amount for which it deemed the applicants to be qualified.

An additional factor relevant to the determination of whether to recognize the existence of a tort duty is the nature of the business of the party upon whom the burden is sought to be imposed. Judge Cardozo commented on the "public calling" of the defendants in *Glanzer v. Shepard* and *Ultramares Corporation v. Touche,* both *supra.* The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill. *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 219–20, 278 A.2d 12, *cert. denied,* 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 98 (1971).

---

**6.** The contract provided for a period of fifty-one days to obtain financing.

The Court of Appeals of Oklahoma, Division 2, imposed a tort duty on a bank to preserve the confidentiality of information submitted by a loan applicant, even in the absence of a finding of a contractual relationship. In finding this duty, the Oklahoma court relied heavily upon the nature of the banking industry and its close relationship with the public interest.

> Banks exist and operate almost solely by using public funds and are invested with enormous public trust. Their financial power within the community amounts to a virtual financial monoploy [sic] in the field of money lending. The legislature has carefully defined their corporate charge within finite limits in direct proportion to their power. *Djowharzadeh v. City Nat. Bank & Trust Co.,* 646 P.2d 616, 619 (Okl.App.1982).

Similarly, in *Duffie v. Bankers' Life Ass'n of Des Moïnes, supra,* the Supreme Court of Iowa, in imposing a duty upon an insurance company to act promptly upon all applications submitted, gave significant if not controlling weight to the facts that an insurance company can operate only under a franchise from the State, and that insurance is a business affected with a public interest.

Without necessarily assigning to it the weight given by the Oklahoma and Iowa courts, we nonetheless consider relevant the public nature of the business. The banking business is affected with the public interest. Traditionally banks and their officers have been held to a high degree of integrity and responsiveness to their public calling. Although not directly applicable to the respondent because of its status as a national bank, the requirements imposed by the Maryland Legislature upon state banks illustrate this State's policy concerning the banking industry. Unlike most other corporations, in Maryland a state bank may not be chartered until there has been an investigation by a state official and a determination that "[t]he character, responsibility, and general fitness of the incorporators and directors named in the articles command confidence and warrant belief that the business of the proposed commercial bank

will be conducted honestly and efficiently ... and [that] [a]llowing the proposed commercial bank to engage in business ... [w]ill promote public convenience and advantage...." Maryland Code, (1980, 1985 Cum.Supp.) § 3–203(b) of the Financial Institutions Article. Furthermore, each director of a commercial bank is required by § 3–404 of that Article to take an oath "to perform diligently and honestly the duties of the office." The recognition of a tort duty of reasonable care under the circumstances presented by this case is thus consistent with the policy of this State as expressed by the Legislature, and reasonable in light of the nature of the banking industry and its relation to public welfare.

We next consider the Bank's contention that the largely judgmental process of evaluating loan applications defies the imposition of a standard. In support of its argument the Bank notes the comment found in the introduction to the underwriting guidelines published by the Federal Home Loan Mortgage Corporation (FHLMC) that "[u]nderwriting mortgage loans is an art, not a science. It cannot be reduced to mathematical formulas, but requires sensitive weighing of the many aspects of the loan...." The same argument, however, might be made in favor of a physician who is required to weigh a multitude of subjective and objective factors before passing judgment on a diagnosis or method of treatment, or on behalf of a motorist whose judgment is subject to scrutiny notwithstanding the constantly changing and almost infinite variety of circumstances with which he is confronted on today's highways. Certainly where judgment is involved there will normally be an area of decisional discretion—factual situations in which reasonably prudent persons will reach different conclusions. One bank may have a conservative approach, while another may be very aggressive in a particular loan market. To be successful then, a plaintiff must show more than that another banker would have approved a loan that was refused, or would have found a customer qualified for a different amount. The plaintiff must show that the defend-

ant failed to exercise that degree of care which a reasonably prudent bank would have exercised under the same or similar circumstances. As in any other negligence case, an industry standard, if it exists, may be proven as evidence of the applicable standard of care.

In the case before us the Jacques produced expert testimony from which the jury could have determined an applicable standard. The evidence showed that consistent with the practice of many banks the respondent retained in its portfolio very few of the loans it made, preferring instead to promptly sell the loans, usually for a profit of one percent. Because a principal purchaser of home mortgages, FHLMC, had established written guidelines for the underwriting of "investment quality" loans, *i.e.*, those of such quality, type and class that generally meet the purchase standards imposed by private institutional investors, these guidelines were widely utilized by commercial banks. Additionally, the Bank conceded that its practice was to make loans "based on guidelines published by the Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association." We reject the notion that a reasonable care standard cannot be applied to this aspect of the banking business.[7]

---

**7.** As summarized by Judge Rosalyn Bell in her concurring opinion for the Court of Special Appeals, *Jacques v. First National Bank,* 62 Md.App. 54, 67, 488 A.2d 210 (1985), the Jacques offered testimony from which the jury could have found that the Bank departed from the applicable standard of care in at least the following respects: 1) The loan officer averaged only two years of the Jacques' income. Bank practice usually involved an evaluation of the applicant's tax returns for the preceding three years. In addition, the officer knew that due to illness the Jacques' income for the two years was lower than usual and, therefore, distorted their financial status; 2) Payments on the Jacques' current home were erroneously included in the calculation. The Bank typically reviewed only unsecured consumer debts, as provided by the guidelines; 3) Income from stock was not considered at all. Its inclusion would have bolstered the strength of the Jacques' income; 4) The loan officer placed excessive weight on the factor of debt-to-income ratio and failed to properly balance that factor against a very favorable credit history and a substantial net worth.

Finally, we consider the suggestion that because the Jacques might have sued for breach of a contractual duty, there is no need to recognize a corresponding tort duty. Although the proof required and the measure of compensatory damages allowable may be essentially the same under either cause of action, there are other considerations, including requirements of venue and limitations on the bringing of actions, that make it desirable to provide a choice of actions. Additionally, where actual malice is shown, punitive damages may be awarded in a tort action but not in an action for breach of contract. *Miller Building Supply v. Rosen*, 305 Md. 341, 348–49, 503 A.2d 1344 (1986); *H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975); *St. Paul at Chase v. Mfrs. Life Insur.*, *supra*. We see no reason to deny a choice of actions in this type of case.

## IV

■ The second question presented by petitioners is whether the Bank owed a duty of care to accede to the applicants' request that no loan be made by the Bank so that the applicants could avoid economic loss. Our earlier discussion is dispositive of this question. The Bank correctly understood its obligation to the Jacques to offer them a loan in an amount for which they qualified at the agreed rate of interest. There was no obligation to refuse to make a loan. The Bank's error, as found by the jury, was its failure to exercise due care in determining the amount of the loan for which the Jacques qualified.

Because the Court of Special Appeals did not reach the question raised by the Jacques in their original appeal, relating to the alleged error of the trial judge in instructing the jury on the Jacques' duty to minimize damages, and because that question was not before us, the case must be remanded to the Court of Special Appeals for further consideration.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR

FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE FIRST NATIONAL BANK OF MARYLAND.