**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALICE F. SCOTT, surviving parent
and personal representative of
deceased, and for the use of
surviving parent of Aaron J. Scott,
deceased,
<u>Plaintiff-Appellant,</u>

v.

MONTGOMERY COUNTY BOARD OF
EDUCATION; DOROTHY W.
DAUGHERTY; ROBERT GETTEMY; JOHN
H. ROBINSON; MARY LEE PHELPS;

RICHARD C. POTTINGER; MICHELLE
DAVIS; FRAZER R. SHEETS; AMY
DUTCHER; LINDA F. WAGNER;
RICHARD WEINFELD; ROBERT FUHRER;
RENEE BRIMFIELD,
<u>Defendants-Appellees,</u>

and

LOUIS JONES; BILLA FISHER; REGINALD
SMITH,
<u>Defendants.</u>

No. 96-2455

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-95-1083-AW)

Argued: July 9, 1997

Decided: August 12, 1997

Before WILKINS, HAMILTON, and WILLIAMS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Kenneth Warren Smith, Alexandria, Virginia, for Appellant. James Louis Parsons, Jr., Assistant County Attorney, Rockville, Maryland, for Appellees. **ON BRIEF:** Roger A. Hayden, II, PASTERNAK & FIDIS, P.C., Bethesda, Maryland, for Appellant. Charles W. Thompson, Jr., County Attorney, Linda B. Thall, Division Chief, Division of Special Projects, Steven M. Gilbert, Assistant County Attorney, Rockville, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Alice Scott (Ms. Scott) appeals the district court's grant of summary judgment in favor of the Board of Education of Montgomery County, Maryland and numerous individual defendants (collectively, the Board) on both federal and state law claims arising out of the suicide of her fourteen-year-old son, Aaron Scott. Because Ms. Scott has produced insufficient evidence from which a reasonable jury could conclude that either the Board or the individual defendants proximately caused the death of her son, we affirm.

I.

Aaron Scott attended Montgomery County Public Schools from 1983 until his death in 1994. Aaron's parents were divorced, and Aaron lived with his mother. However, Aaron's father remained an active part of Aaron's life, visiting him regularly.

Beginning in his seventh grade year, Aaron began to have behavioral problems, getting into fights and refusing to do his school work. In November 1992, an Educational Management Team (EMT) meeting was held to address Aaron's behavioral and learning problems. Following a subsequent psychological consultation between school psychologist Dorothy Daugherty and Aaron, the EMT referred Aaron for a special education admission, review, and dismissal (ARD) screening.

The first ARD meeting concerning Aaron took place in January 1993. At the meeting, Daugherty suggested that Aaron may suffer from attention deficit disorder (ADD) and suggested an educational and psychological assessment, to which both of Aaron's parents agreed. As a result of these assessments, it was determined that Aaron had a serious emotional disturbance (SED) and that Aaron was eligible for special educational services. These assessments and the diagnosis were discussed with Aaron's parents on March 11, 1993 at a follow-up ARD meeting. During this meeting, Mr. Scott mentioned that Aaron had threatened to run in front of an eighteen-wheeler. Also during this meeting, Daugherty recommended psychiatric and medical evaluations for Aaron and suggested that the Scotts get Aaron help outside of school. Although outside counseling was suggested, both Mr. and Ms. Scott contend that when they asked what services were available, school officials were unable to recommend any particular source of counseling services. Ms. Scott apparently looked into obtaining psychological counseling for Aaron but was unable to afford the counseling that was available.

On April 1, 1993, Aaron was involved in a fight with another student and was suspended from school beginning April 2. Between April 2 and April 30, Aaron did not receive any educational or related services. On April 15, 1993, another ARD meeting was conducted, at which an individualized education program (IEP) was developed for Aaron. Although Aaron's therapy needs and disordered thinking were discussed, as well as the possibility that he might have ADD, there were no provisions for psychological counseling contained in the IEP. Neither Mr. nor Ms. Scott signed Aaron's IEP.

On June 28, 1993, the Board notified Ms. Scott that the Central Placement Unit recommended the Mark Twain School (Mark Twain)

3

as the appropriate educational placement for Aaron for the 1993-94 school year. After beginning school at Mark Twain in the fall of 1993, Aaron was involved in two incidents in which he pushed or hit other students. On November 23, 1993, an ARD meeting concerning Aaron was held at Mark Twain. At this meeting, an updated IEP was developed for Aaron, and it was determined that Aaron had not yet met the criteria for mainstreaming, which is the process by which a special education student makes the transition into a general education setting. Therefore, Aaron would continue at Mark Twain.

Although Aaron was involved in another serious incident at Mark Twain in December 1993, in January 1994, school officials determined that Aaron had satisfied the criteria for mainstreaming. Therefore, Aaron began attending two periods per day at the Mark Twain satellite program at Ridgeview Middle School (Ridgeview). Neither Mr. nor Ms. Scott recalls being notified that Aaron was to begin attending two classes a day at Ridgeview, but a school official stated in an affidavit that Ms. Scott was informed of the school's decision and that Mr. Scott attended an intake meeting at Ridgeview before Aaron began his classes there.

In early March 1994, Aaron began attending two classes a day at Ridgeview, a math class taught by Frazer Sheets and a social skills class taught by Nancy Hopkinson. These classes were conducted in an intensive special education setting and were taught by special education teachers with small classes. According to Ms. Scott, Aaron began to have problems in Sheets' math class almost immediately. In just over a month after his placement at Ridgeview, Aaron was involved in five behavioral incidents. During one of these incidents, on March 23, 1994, Aaron told Sheets that he did not want to do his school work; that he would be dead before he was twenty years old anyway; and that if he was not dead by the time he was twenty, he would kill himself. Following the incident, Sheets referred Aaron to school psychologist Richard Fuhrer, who spoke with Aaron for approximately thirty minutes the next day. During Fuhrer's meeting with Aaron, Aaron was vague about the suicide threat and stated that he did not like math and did not want to do the assignment. According to Fuhrer, Aaron denied any suicidal intent and seemed embarrassed about making the statement. Fuhrer determined that Aaron had no preoccupation with suicide and concluded that Aaron was not in

4

imminent danger of harming himself. Neither Fuhrer nor any other school official informed Mr. or Ms. Scott that Aaron had made these statements. Aaron met with Fuhrer again following another serious incident during which Aaron threw a chair and verbally abused a teacher. During that meeting, on April 6, 1994, Aaron indicated that he wished to return to Ridgeview and that he felt that he could behave appropriately in the future.

In April 1994, Ms. Scott requested a change in Aaron's math placement because he continued to have difficulty in Sheets' class. School officials discussed the requested change but decided against it because remaining in Sheets' class was the only way for Aaron to remain mainstreamed for two classes a day. On April 26, 1994, another ARD meeting took place to discuss Aaron's progress. At the meeting, which Mr. Scott attended, Mr. Scott suggested that Aaron's math placement should be changed. School officials did not agree, and the parties decided to continue Aaron at Ridgeview for two periods a day and to increase his mainstream time to four periods a day in the fall of 1994, if it was decided at that time that such a change was appropriate.

On May 27, 1994, a final serious incident occurred during Sheets' math class. After Sheets confronted Aaron for not doing his "warm-up exercises" and publicly warned Aaron that he would fail if he did not complete his work, Aaron became upset, threatened to hurt Sheets, and shoved Sheets twice before leaving the room with another staff member. Aaron was immediately suspended for five days and was picked up from school by his father who took Aaron to Ms. Scott's home, where Aaron resided. Although Ms. Scott came home for lunch and spoke with Aaron, she left Aaron alone for the afternoon with the admonishment not to leave the house. At approximately 5:00 p.m., Ms. Scott returned home from work and found Aaron at home watching television. According to Ms. Scott, Aaron did not appear depressed at that time. Some time after dinner, Ms. Scott fell asleep in her room and woke up shortly after 10:00 p.m. Noticing that the light was still on in Aaron's room, she walked in and found Aaron in a kneeling position with a cord around his neck and the other end tied to a weight bench. Aaron had apparently hanged himself. Ms. Scott called emergency personnel immediately, and Aaron was transported to the hospital where he was pronounced dead at 12:05 a.m.

5

on May 28, 1994. In a suicide note written at 10:00, **1** Aaron wrote that sometimes he felt like killing himself; that he hoped that he would die quickly and that it would not be painful; that he thought he would hang himself; and that he hoped he died in peace.

On April 11, 1995, Ms. Scott filed this action, as surviving parent and as personal representative of Aaron, in the United States District Court for the District of Maryland. In her second amended complaint, Ms. Scott alleges causes of action for violations of the Fifth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. §§ 1983 and 1988; violations of § 504 of the Rehabilitation Act of 1973, see 29 U.S.C. § 794; and violations of the Individuals with Disabilities Education Act (IDEA), see 28 U.S.C. §§ 1400-1485. In addition, she alleges state common law claims for intentional or reckless infliction of emotional distress, wrongful death, and professional negligence.

In support of her claims, Ms. Scott obtained the expert testimony of Mary O. Hepple, an educational consultant and special education expert. In her affidavit, Ms. Hepple notes that Aaron's ARD team called for complete psychiatric and medical evaluations as early as March 1993, yet no evaluations were performed. As a result, according to Ms. Hepple, the extent of Aaron's disability was never resolved, and none of the IEPs formulated for Aaron were reasonably calculated to confer an educational benefit on Aaron. Ms. Hepple states further that in light of the repeatedly expressed need for therapy and counseling, the referral to a school psychologist in response to individual incidents would not address Aaron's emotional and behavioral support needs.

Ms. Scott also submitted the expert reports of two clinical psychologists, Dr. Sue Ellen Antell and Dr. David A. Shostak. After reviewing Aaron's school files, Dr. Antell opined that school psychologists failed to adequately diagnose a serious psychiatric disorder and that this undiagnosed disorder was directly implicated in Aaron's death. Dr. Antell opined further that had psychiatric services been appropriately provided, there is a high degree of probability that Aaron would

_____

**1** It is not clear whether this note was written at 10:00 a.m. or 10:00 p.m.

6

have responded postitively. Dr. Antell concluded that the school system and its employees "materially contributed to the causes of [Aaron's] eventual suicide." (J.A. 641). Dr. Shostak completed an expert report on behalf of Ms. Scott and opined that Aaron's death was highly preventable, implying that Aaron's problems in school contributed to his decision to commit suicide.

On April 29, 1996, the Board moved for summary judgment as to all claims asserted by Ms. Scott. In support of its motion, the Board submitted deposition testimony from Ms. Scott and Mr. Scott, concerning other problems in Aaron's family. Ms. Scott acknowledged in her deposition that both Anthony and her oldest son, William, had tried to commit suicide by taking an overdose of pills. According to Ms. Scott, William took an overdose of pills on more than one occasion during the late 1980s, while Anthony took an overdose of pills one time approximately four or five years before Aaron committed suicide. Ms. Scott also testified that her son William was addicted to narcotics, had been abusive to family members, and had been kicked out of her home. Ms. Scott testified that Aaron was aware of William's problems and would hide his money so that William would not steal it. Mr. Scott testified about Aaron's statement that he would run in front of an eighteen-wheeler. According to Mr. Scott, he did not think that Aaron was serious when he made the statement and, therefore, he did not seek any medical help for Aaron following the statement.

On June 17, 1996, Ms. Scott filed a cross-motion for partial summary judgment on the issue of liability. On August 24, 1996, the district court conducted a hearing on the motions and ruled from the bench in favor of the Board. Five days later, on August 29, 1996, the district court entered judgment in favor of the Board. Ms. Scott noted a timely appeal.

II.

Whether a party was entitled to summary judgment is a matter of law which we review de novo. Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

7

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

III.

Under each of Ms. Scott's state law claims, causation is an element that must be shown to establish liability in Maryland. Ms. Scott's state common law claims are for negligence, intentional infliction of emotional distress, and wrongful death. Each of these causes of action requires that there be a causal connection between the act complained of and the injury sustained. See Medical Mut. Liability Soc'y of Md. v. B. Dixon Evander & Assoc., Inc., 660 A.2d 433, 439 (Md. 1995) ("In any tort action, the plaintiff must establish that the defendant's tortious conduct was a cause in fact of the injury for which compensation is sought. . . . In addition, the plaintiff must establish that any damages sought are a `natural, proximate and direct effect of the tortious misconduct.'" (citation omitted)); Eisel v. Board of Educ. of Montgomery County, 597 A.2d 447, 454-55 (Md. 1991) (wrongful death); Harris v. Jones, 380 A.2d 611, 614 (Md. 1977) (intentional infliction of emotional distress).

Under her federal law claims, to the extent that causation of injury is not an element required to establish liability, a plaintiff seeking compensatory damages for an injury must show that the damages were caused by the statutory or constitutional violation in order to obtain relief. See Price v. City of Charlotte, 93 F.3d 1241, 1245 (4th Cir. 1996) (damages are available under § 1983 for actions found to have caused compensable injury), cert. denied, 117 S. Ct. 1246 (1997). In this case, all of the damages Ms. Scott seeks stem directly from Aaron's suicide, on the grounds that the Board's alleged violations of IDEA, § 504 of the Rehabilitation Act, the Fifth and Fourteenth Amendments, and state common law duties proximately caused Aaron to commit suicide. Therefore, causation is central to each of Ms. Scott's claims, both state and federal.

With regard to the state law claims, under Maryland law, "[p]roximate cause will only be established if there is a reasonable connection between the defendant's alleged negligence and the plaintiff's injuries." Washington Metro. Area Transit Auth. v. Reading, 674

8

A.2d 44, 52 (Md. Ct. Spec. App. 1996). In other words, "[p]roximate cause exists `where there is a complete continuance and unbroken sequence between the act complained of and the act finally resulting in the injury, so that one may be regarded by persons of ordinary judgment as the logical and probable cause.'" Vito v. Sargis & Jones, Ltd., 672 A.2d 129, 139 (Md. Ct. Spec. App. 1996) (quoting Lashley v. Dawson, 162 Md. 549, 562 (1932)), aff'd sub nom., Cogan Kibler, Inc. v. Vito, 1997 WL 340755 (Md. June 23, 1997); see also Medical Mut. Liab. Soc'y v. B. Dixon Evander & Assoc., Inc. , 660 A.2d 433, 439 (Md. 1995) (to establish tort liability, "the plaintiff must establish that any damages sought are the `natural, proximate and direct effect of the tortious misconduct'" (citation omitted)).

In this case, the only evidence of causation comes from the expert reports filed by Ms. Scott. Specifically, Dr. Antell, a clinical psychologist, concludes in her report that the Board "materially contributed to the causes of [Aaron's] eventual suicide." (J.A. 641). In support of this conclusion, Dr. Antell states that had the psychiatric evaluations and counseling to which Aaron was entitled been provided, "there is a high degree of probability" that Aaron would have responded to the counseling and the events leading up to his suicide would not have occurred. (J.A. 640-41). Dr. Antell states further that it is also likely that had Aaron's condition "been met with intensification of services" by the Board, Aaron "would have experienced a reduction in stresses which are believed to be materially related to his suicide." Id.

In assessing the sufficiency of this evidence for purposes of creating a genuine issue of material fact as to the element of proximate cause, we note that in formulating these opinions, Dr. Antell relied solely on documents maintained by the Board, which she acknowledges may not represent Aaron's entire file. In addition, Dr. Antell states in her report that "the formulation of a final and complete opinion" will require access to additional school records and other information and the opportunity to interview individuals familiar with Aaron's circumstances prior to his death, which she details. We note further that in discussing her conclusions and the evidence on which she bases her conclusions, Dr. Antell's report does not include any reference to Aaron's family or problems he may have had at home. Instead, she focuses solely on stressors in the school environment.

9

Although Dr. Antell certainly suggests that the Board's failure to obtain psychological services for Aaron likely contributed to his eventual suicide, this evidence is not sufficient evidence from which a reasonable jury could conclude that there was "a complete and unbroken sequence" between the failure to provide psychological counseling and Aaron's suicide, see Vito, 672 A.2d at 139, or that Aaron's suicide was "the natural, proximate and direct effect" of the Board's alleged failures, see Medical Mut. Liab. Soc'y, 660 A.2d at 439. For example, Dr. Antell opines that it is likely that had Aaron received appropriate psychiatric services, many of the confrontations that exacerbated his illness would have been minimized, and he would have experienced a reduction in stresses. However, to reach the conclusion that the lack of psychological counseling was a proximate and legal cause of Aaron's suicide, the jury would have to assume, first, that the stressors and confrontations to which Dr. Antell refers directly caused Aaron's suicide and, second, that a mere reduction in these stressors would have prevented Aaron's suicide. Dr. Antell does not describe a natural, direct causal relationship between the Board's alleged failures and Aaron's suicide sufficient to constitute proximate cause, as defined in Maryland. Stated differently, from the record, which contains evidence of numerous stressors in Aaron's life, it is impossible to discern why Aaron tragically took his own life, and to conclude that the Board's alleged failures were causally related to Aaron's suicide is conjecture. Because Dr. Antell's report is the only evidence of causation presented by Ms. Scott, she has not produced sufficient evidence from which a reasonable jury could find that the Board's actions or inactions proximately caused Aaron Scott's suicide.[2]

_____

[2] We note that even if Ms. Scott had produced sufficient evidence of a causal connection between the lack of psychological counseling offered to Aaron and his eventual suicide, each of her state law claims fails on other grounds. For example, Ms. Scott's claim for intentional or reckless infliction of emotional distress fails because there is no evidence that the Board's conduct was "extreme and outrageous" or "intentional and reckless." See Harris v. Jones, 380 A.2d 611, 614 (Md. 1977). As for Ms. Scott's claim of negligence, Maryland has expressly declined to recognize a cause of action for negligence against education officials accused of failing to properly educate a student, or "educational malpractice." See Hunter v. Board of Educ. of Montgomery County, 439 A.2d 582, 584-85 (Md. 1982). Finally, with regard to her claim for wrongful death,

The same reasoning precludes awarding Ms. Scott the relief she requests for the alleged federal constitutional and statutory violations. Ms. Scott simply has not shown that the Board's alleged failures caused her son to commit suicide and, therefore, any federal violations committed by the Board in failing to adequately provide for Aaron's education will not support an award of damages stemming from Aaron's death. Because causation is a central element to all of Ms. Scott's claims and because Ms. Scott has not produced sufficient evidence from which a reasonable jury could conclude that the alleged violations were a legal cause of Aaron's suicide, the district court's grant of summary judgment in favor of the Board must be affirmed.

IV.

For the foregoing reasons, the judgment of the district court in favor of the Board is affirmed.

AFFIRMED

_____

although Maryland has recognized a duty on the part of school officials to notify a student's parents when they learn of a suicide threat by the student, see Eisel v. Board of Educ. of Montgomery County, 597 A.2d 447, 456 (Md. 1991), there is no evidence in this case that the Board's failure to inform Ms. Scott of Aaron's declaration that if he was not dead by twenty he would kill himself was causally related to Aaron's suicide, as required under Eisel, see id. at 450. Indeed, both Mr. and Ms. Scott were aware of an earlier threat by Aaron to run in front of an eighteen-wheeler, and it does not appear that the Scotts took any steps to obtain psychological counseling for Aaron at that time. In addition, unlike the threat in Eisel, where the threat of suicide involved imminent action, see id. at 449; cf. Hammond v. Board of Educ. of Carroll County, 639 A.2d 223, 227 (Md. 1994) (distinguishing Eisel, in part, on the basis that the threat in Eisel was of impending intentional harm), Aaron's threat was not of imminent action.

11