597 A.2d 447

Stephen **EISEL**

v.

**BOARD OF EDUCATION OF MONTGOMERY
COUNTY, Maryland, et al.**

No. 139, Sept. Term, 1990.

Court of Appeals of Maryland.

Oct. 29, 1991.

Edward H. Gerstenfield, Bethesda, for appellant.

Joann Robertson, Sr. Asst. County Atty. (Joyce R. Stern, County Atty., J. Stephen McAuliffe, Asst. County Atty., all on brief), Rockville, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and ALAN M. WILNER, Chief Judge of the Court of Special Appeals, Specially Assigned.

RODOWSKY, Judge.

The legal theory advanced by the plaintiff in this wrongful death and survival action is that school counselors have a duty to intervene to attempt to prevent a student's threatened suicide. The specific question presented is whether the duty contended for may be breached by junior high school counselors who fail to inform a parent of suicidal statements attributed to the parent's child by fellow students where, when the counselors sought to discuss the subject, the adolescent denied ever making the statements. The circuit court granted summary judgment for the defendants, premised on the absence of any duty. As explained below, we shall hold that summary judgment was erroneously entered.

The decedent, Nicole Eisel (Nicole), was a thirteen year old student at Sligo Middle School in Montgomery County. She and another thirteen year old girl consummated an apparent murder-suicide pact on November 8, 1988. Nicole's father, Stephen Eisel (Eisel), brought the instant action. His amended complaint alleges negligence on the part of two counselors at Nicole's school, among others. In order to state the facts that are before us, and to determine

the scope of the issues for decision on this appeal, we must review the procedural history.

## I

Eisel's complaint, filed in March 1989, joined as defendants the Board of Education of Montgomery County (the Board), "Montgomery County Public Schools"[1] and three individuals, the Superintendent of Schools of Montgomery County, the principal of Sligo Middle School, and Dorothy Jones (Jones), Nicole's counselor. The defendants filed an answer. Thereafter the parties engaged in discovery. Answers to interrogatories and documents produced are part of the record. Full copies of depositions were not filed in the court. Documents produced included the Board's memorandum of a telephone call on November 10, 1988, from the identified mother of a child at Sligo Middle School. That parent reported that children in her car pool said that Deidre Morgan (Morgan), another school counselor, knew of Nicole's suicide threats. Eisel amended his complaint to join Morgan as an additional defendant.

Shortly thereafter the defendants filed a "Motion to Dismiss the Amended Complaint and/or Motion for Summary Judgment." Among other grounds, the motion asserted that the "[d]efendants owed no duty to the plaintiff or plaintiff's decedent."

The hearing on the defendants' motion resulted in a final judgment entered on the docket as, "Order of Court ... granted the defendants' motion to dismiss complaint with prejudice." The transcript of the hearing reflects that a number of rulings were made. The circuit court ruled that allegations of negligence against the superintendent and school principal were insufficient. The court ruled that "Montgomery County Public Schools" was not an entity

---

1. "Montgomery County Public Schools" is the name by which the Board of Education of Montgomery County describes itself on letterheads and other documents in the record.

separate from the Board of Education. These rulings are not challenged on this appeal.

With respect to the Board, Jones, and Morgan, counsel for the defendants accepted the allegations of the amended complaint as true, for purposes of the motion. On that basis defendants' counsel argued, as a matter of law, the absence of any duty and the lack of proximate cause. The circuit court ruled that proximate cause was a question for the jury, but that public policy considerations precluded legally recognizing any duty on the remaining defendants to intervene for the purpose of attempting to prevent suicide.

Eisel appealed. We issued the writ of certiorari on our own motion prior to consideration of the matter by the Court of Special Appeals.

Eisel's brief characterizes the appeal as one from the grant of summary judgment. The defendants view the judgment as one entered on the grant of a motion to dismiss for failure to state a claim upon which relief can be granted. Eisel's analysis is correct. Under Maryland Rule 2–322(b) it is permissive to raise, by motion to dismiss, the defense of failure to state a claim upon which relief can be granted, if the motion is made before answer is filed. If the defense is not made by a threshold motion, it "may be made in the answer, or in any other appropriate manner after answer is filed." *Id.* "A defense of failure to state a claim upon which relief can be granted ... may be made ... by motion for summary judgment under Rule 2–501 or at the trial on the merits." Md.Rule 2–324(a). Here, the procedural tool used by the defendants was a motion for summary judgment, but the defendants chose to argue their motion as if it were one to dismiss for failure to state a claim.[2] Because,

---

**2.** Discovery material in the record, and the arguments by counsel at the motion hearing, reflect that there is a dispute over whether the counselors were ever advised by Nicole's fellow students, before Nicole's death, that Nicole was contemplating suicide. The defendants never argued that they were entitled to summary judgment because Eisel could not produce competent evidence sufficient to support a finding that the counselors were so advised.

for purposes of the motion, the defendants and the trial court accepted the allegations of the amended complaint as true, we shall do the same. Nevertheless, because judgment was entered on summary judgment, we are free to state from the record, in addition to the accepted allegations, admissible facts which are favorable to Eisel's claim. Further, because the appeal is from the grant of a summary judgment, our review of whether judgment was properly entered looks only to the ground relied upon by the trial judge for granting the motion, *i.e.*, the absence of duty. *See Boyer v. State*, 323 Md. 558, 588 & n. 19, 594 A.2d 121, 136 & n. 19 (1991); *Finci v. American Casualty Co.*, 323 Md. 358, 381–82, 593 A.2d 1069, 1081 (1991).

## II

The amended complaint avers that Nicole became involved in satanism, causing her to have an "obsessive interest in death and self-destruction." During the week prior to the suicide, Nicole told several friends and fellow students that she intended to kill herself. Some of these friends reported Nicole's intentions to their school counselor, Morgan, who relayed the information to Nicole's school counselor, Jones. Morgan and Jones then questioned Nicole about the statements, but Nicole denied making them. Neither Morgan nor Jones notified Nicole's parents or the school administration about Nicole's alleged statements of intent. Information in the record suggests that the other party to the suicide pact shot Nicole before shooting herself. The murder-suicide took place on a school holiday in a public park at some distance from Sligo Middle School. The other party to the pact attended another school.

## III

There is no direct Maryland precedent on the issue before us. We have not been cited to, nor have we found, any decision by any other court that deals with the issue of duty on substantially similar facts. Before the circuit court the defendants' argument that the counselors owed no duty to

intervene rested largely on language in judicial decisions that defendants say are analogous.

On the issue of duty Eisel argued that, by the School Board's own policy, counselors were required to contact the parents of any child who had expressed suicidal thoughts. Eisel pointed to deposition testimony on that subject by the principal, who said: "If the student is in danger, of course, you take care of that first. Then the next thing you do would be to notify a parent. If the student is in no apparent danger, you will notify the parent."

There appear to be two broad categories of cases in which a person may be held liable for the suicide of another. The first type occurs when the defendant's conduct actually causes the suicide, as when a negligent driver causes head injuries that lead to psychosis. *See Fuller v. Preis,* 35 N.Y.2d 425, 322 N.E.2d 263, 363 N.Y.S.2d 568 (1974). It is not contended here that Nicole's suicide was caused, in that sense, by the defendants' conduct.

The second type of case holds that a special relationship between a defendant and the suicidal person creates a duty to prevent a foreseeable suicide. For instance, many courts have held that a hospital or a prison that has custody over a person who commits suicide may be liable if the suicide was foreseeable. *See* Annotation, *Civil Liability for Death by Suicide,* 11 A.L.R.2d 751, §§ 13.5–14 (1950 & Supp.1985). In *State ex rel. Shockey v. Washington Sanitarium & Hosp.,* 223 Md. 554, 557, 165 A.2d 764, 765–66 (1960), we said:

"[T]here is a duty upon a sanitarium or hospital to exercise such care in looking out for and protecting a patient as the circumstances, including known mental and physical conditions, may reasonably require. Failure to do so may be negligence, and if suicide is a proximate result of the negligence, recovery may be had under the wrongful death statute...."

At least one case has concluded that a professional therapist may be held liable when a patient commits suicide, even

if the therapist or the therapist's hospital does not have custody over the patient. *Bellah v. Greenson,* 81 Cal. App.3d 614, 620, 146 Cal.Rptr. 535, 538 (1978); *but see Nally v. Grace Community Church of the Valley,* 47 Cal.3d 278, 295–96, 763 P.2d 948, 958, 253 Cal.Rptr. 97, 107–08 (1988) (limiting *Bellah* ), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). Liability against therapists for outpatient suicides is rarely imposed, *e.g., Farwell v. Un,* 902 F.2d 282 (4th Cir.1990) (applying Maryland law); Comment, *Civil Liability for Causing or Failing to Prevent Suicide,* 12 Loy.L.A.L.Rev. 967, 993 (1979), and some commentators have suggested that liability under these circumstances should never be imposed. *See id.* at 993 & n. 142.

Recent attempts to extend the duty to prevent suicide beyond custodial or therapist-patient relationships have failed. For instance, the Supreme Court of California refused to impose a duty on a church pastor to refer a twenty-four year old suicidal counselee to a mental health professional. *Nally,* 47 Cal.3d at 299–300, 763 P.2d at 960–61, 253 Cal.Rptr. at 110. Although on its facts *Nally* dealt only with religious counselors, the court appeared to extend its no-duty rule to all "nontherapist counselors," who were defined as "persons other than licensed psychotherapists, who counsel others concerning their emotional and spiritual problems." *Id.* at 283, 763 P.2d at 949–50, 253 Cal.Rptr. at 99.

In *McLaughlin v. Sullivan,* 123 N.H. 335, 461 A.2d 123 (1983), a jail prisoner killed himself within twelve hours of incarceration after his conviction on burglary and drug charges. The administrator of the suicide's estate sued his attorney for legal malpractice. The Supreme Court of New Hampshire held that the attorney had no duty to prevent the suicide because she neither had custody or control over the defendant nor did she have the "expertise or the training necessary to judge or foresee that a client will commit suicide." *Id.* at 342, 461 A.2d at 127; *see also Snyder v. Baumecker,* 708 F.Supp. 1451, 1463 (D.N.J.1989); *McPeake*

*v. Cannon*, 381 Pa.Super. 227, 553 A.2d 439 (1989). In *Krieg v. Massey*, 239 Mont. 469, 781 P.2d 277 (1989), an apartment manager had reason to believe an elderly tenant was suicidal and attempted to remove the tenant's handgun, but ultimately left it within the tenant's reach. The court found the manager had no duty to prevent the subsequent suicide because she was not in a custodial relationship with the tenant.

Probably the closest case, factually, to the matter before us is *Bogust v. Iverson*, 10 Wis.2d 129, 102 N.W.2d 228 (1960). The parents of a college student who killed herself sued a college professor-counselor. The suicide occurred about six weeks after the counselor suggested terminating counseling sessions with the student. The court held that the counselor had no duty to secure psychiatric treatment for the student or advise her parents of her emotional state because the plaintiff had alleged no facts showing that the counselor was apprised that the student had suicidal tendencies. One commentator has cited this ruling as potentially establishing a duty when such facts are alleged. *See* Comment, *supra*, 12 Loy.L.A.L.Rev. at 991.

The custody rule is extended, arguably unjustifiably, well beyond the confines of the instant matter in *Sneider v. Hyatt Corp.*, 390 F.Supp. 976 (N.D.Ga.1975). That court refused to grant summary judgment for a hotel company which claimed it could not be liable for the death of a registered guest who jumped from the twenty-first floor of the hotel. The plaintiff had alleged that the hotel's management was aware that the hotel had become an "attractive location for suicides," and that the decedent was inebriated, had no luggage and was seen by hotel employees wandering in a confused state on the twenty-first floor. The court acknowledged that a hotel has less control over a customer than does a hospital over a patient. Nonetheless, the court refused to decide that the hotel had no duty at all. *Id.* at 979–81.

A number of factors distinguish the instant matter from those cases finding an absence of any duty, reviewed above,

in which the custodial relationship between the suicide victim and the defendant was other than that of hospital and patient or jailer and prisoner. Eisel's claim involves suicide by an adolescent. The negligence relied on is a failure to communicate to the parent the information allegedly possessed by the defendants concerning the child's contemplated suicide, not a failure by the school authorities physically to prevent the suicide by exercising custody and control over Nicole. The theory of Eisel's case is that he could have exercised his custody and control, as parent, over Nicole, had he been warned, and inferentially, that there was nothing known to the counselors about Eisel's relationship with Nicole that would make such a warning unreasonable. *Compare Farwell v. Un,* 902 F.2d at 288–89 (limited duty to prevent suicide on a physician who had no authority to commit a patient involuntarily) *with* Md.Code (1982, 1990 Repl.Vol.), § 10–610 of the Health–General Article (parent's right to apply for, and consent to, "voluntary" commitment for up to twenty days of minor child suffering from mental disorder [3]).

Further, we have recognized

"the doctrine that the relation of a school vis á vis a pupil is analogous to one who stands in loco parentis, with the result that a school is under a special duty to exercise reasonable care to protect a pupil from harm, *Segerman v. Jones,* 256 Md. 109, 123–24, 259 A.2d 794, 801 (1969); Restatement (Second) of Torts § 320 at 130 (1965); 2 Harper and James, The Law of Torts § 18.7 at 1058 (1956); Annot., 86 A.L.R.2d 489, 565–68 (1962); Annot., 32 A.L.R.2d 1163, 1178–81 (1953); Annot., 160 A.L.R. 7, 155–56 (1946)."

---

**3.** There are, of course, various statutory and constitutional restrictions on a parent's right to commit a child against the child's will. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 604, 99 S.Ct. 2493, 2505, 61 L.Ed.2d 101, 120 (1979) (parents retain plenary authority to seek institutionalization of their children subject to physician's independent judgment).

*Lunsford v. Board of Educ.*, 280 Md. 665, 676, 374 A.2d 1162, 1168 (1977) (footnote omitted).[4]

Finally, the relationship of school counselor and pupil is not devoid of therapeutic overtones. The "Counselor Job Description," published by the Department of Professional Personnel of the Board lists the first two "[p]riorities of the counseling profession" to be:

"1. Counseling with individuals and groups concerning school adjustment, physical and emotional development, educational planning, and career awareness. . . .

"2. Identifying students with significant problems and taking steps to provide help for these students."

The defendant Jones has been a counselor in the Montgomery County school system since 1977. She holds an M.A. in guidance and counseling. Her answers to interrogatories include the following:

*"Continuum Education:*

Psychiatric Institute (1979)—6 hrs., Crisis Intervention Techniques

Frost Center (1984)—2 hrs., Suicide Warnings—Steps to Follow

Crisis Psychiatric Services (1987)—Suicide."

Given the peculiar mix of factors presented, it is an open question whether there is a duty to attempt to prevent an adolescent's suicide, by reasonable means, including, in this case, by warning the parent. Therefore, we must analyze whether we should recognize a duty in this case.

## IV

A tort duty is "an expression of the sum total of those considerations of policy which lead the law to say that the

---

**4.** The harm in *Lunsford* was an assault and battery, inflicted on a student who was en route to his home after having been released from school, where there was evidence that the school authorities knew of the danger. The jury verdict was for the defendant. This Court found no error in the proceedings. Two dissenting judges believed it was error to submit the issue of contributory negligence to the jury.

plaintiff is entitled to protection." *Jacques v. First Nat'l Bank*, 307 Md. 527, 533, 515 A.2d 756, 759 (1986) (quoting *Prosser & Keeton on the Law of Torts* § 53, at 358 (5th ed. 1984)). "[A]mong the variables to be considered in determining whether a tort duty should be recognized are:

> '[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.' "

*Village of Cross Keys, Inc. v. United States Gypsum Co.*, 315 Md. 741, 752, 556 A.2d 1126, 1131 (1989) (quoting *Tarasoff v. Regents of Univ. of Calif.*, 17 Cal.3d 425, 434, 551 P.2d 334, 342, 131 Cal.Rptr. 14, 22 (1976)). *See also Ashburn v. Anne Arundel County*, 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986).

### A. Foreseeability and Certainty of Harm

Foreseeability is the most important variable in the duty calculus, *Ashburn*, 306 Md. at 628, 510 A.2d at 1083, and without it there can be no duty to prevent suicide. Comment, *Civil Liability for Suicide*, 12 Loy.L.A.L.Rev. at 991. Here Nicole's suicide was foreseeable because the defendants allegedly had direct evidence of Nicole's intent to commit suicide. That notice to the defendants distinguishes this case from *Bogust v. Iverson*, 10 Wis.2d 129, 102 N.W.2d 228, where the counselor had no notice of contemplated suicide.

The degree of certainty that Eisel and Nicole suffered the harm foreseen is one hundred percent.

Nor would reasonable persons necessarily conclude that the harm ceased to be foreseeable because Nicole denied any intent to commit suicide when the counselors undertook

to draw out her feelings, particularly in light of the alleged declarations of intent to commit suicide made by Nicole to her classmates. "An adolescent who is thinking of suicide is more likely to share these feelings with a friend than with a teacher or parent or school guidance counselor. But, we all—parents, teachers, administrators, service providers and friends—can learn what the warning signs are and what to do." 3 Maryland Office for Children and Youth, *Monthly Memo,* at 3 (Apr.1986). Jurors, as triers of fact, may well conclude that the quoted point of view is consistent with their own experiences with adolescents. On the other hand, when the facts of this case are fully developed, the court may conclude that the duty did not arise, or jurors may conclude that it had not been negligently breached.

### B. Policy of Preventing Future Harm

The General Assembly has made it quite clear that prevention of youth suicide is an important public policy, and that local schools should be at the forefront of the prevention effort. A Youth Suicide Prevention School Programs Act (the Act) was enacted by Chapter 122 of the Acts of 1986, codified as Md.Code (1978, 1989 Repl.Vol.), §§ 7–4A–01 through 7–4A–06 of the Education Article (EA). The uncodified preamble to the Act states that "[t]he rate of youth suicide has increased more than threefold in the last two decades," and that "[o]ver 5,000 young Americans took their lives [in 1985], including over 100 young people in Maryland...."

Further legislative findings and declarations are set forth in EA § 7–4A–01. "A statewide Youth Suicide Prevention School Program is essential to address" the problem. § 7–4A–01(1). "County suicide prevention and crisis center agencies along with local education agencies are best suited for developing and implementing programs for statewide youth suicide prevention." § 7–4A–01(5). Section 7–4A–03(a)(1) provides for a statewide Youth Suicide Prevention School Program administered by the State Department of Education in cooperation with, *inter alia,* participating local

education agencies. Any program established under the Act "shall ... [t]rain school personnel in individual and school wide strategies for teenage suicide prevention." EA § 7–4A–04(c)(2).

In 1987 the Maryland State Department of Education (the Department) published its "YOUTH SUICIDE PREVENTION SCHOOL PROGRAM for the Public Schools of Maryland." It presented goals, objectives and strategies for youth suicide prevention, intervention and "postvention," *i.e.*, "coping with the aftermath of a student's attempted suicide, or completed suicide." *Id.* at 2.

Nicole's school had a suicide prevention program prior to her death. Eisel requested that the Superintendent of Schools for Montgomery County produce "all published rules ... or other written directives available as of November 1, 1988, to ... counselors ... or other school system staff relating to staff responses to alleged student intent to commit suicide." In response, the superintendent produced, *inter alia,* a memorandum dated February 18, 1987, from the office of the principal to the staff of Sligo Middle School on the subject of "Suicide Prevention." It consists of a top sheet setting forth the "steps [that] must be followed."[5] The top sheet is supplemented by materials on other pages reproduced from various sources. These materials include lists of the methods of, and motives for, suicide and impor-

---

5. The description of the steps, in relevant part, reads:
   "1.  Notify the appropriate grade level counselor and administrator immediately.
   "2.  It will be the grade level administrator's responsibility to call a team meeting....
   "3.  The committee will decide jointly as to the next steps—i.e., contacting parents, outside agencies, etc.
   "4.  Reminders:
      (a) Our counselors are trained to counsel with a youngster who is contemplating suicide;  there are also full-time professionals who are available.
      (b) Confidentiality is not an issue—it makes for more sense to pick up the pieces of a teacher/pupil relationship *after* the crisis is over.
      (c) The student should not be left alone at any time."

tant warning signs ("[A]lmost all who have committed suicide *have* communicated their intent beforehand."). Part IX lists ten answers to the question, *"How Can You Help In A Suicidal Crisis?"* Answer D is:

"Tell others—As quickly as possible, share your knowledge with parents, friends, teachers or other people who might be able to help. Don't worry about breaking a confidence if someone reveals suicidal plans to you. You may have to betray a secret to save a life."

There is no indication in the Act that the Legislature intended to create a statutorily based cause of action against school counselors who negligently fail to intervene in a potential suicide. Nevertheless, holding counselors to a common law duty of reasonable care to prevent suicides when they have evidence of a suicidal intent comports with the policy underlying this Act.

## C. Closeness of Connection Between Conduct and Injury

This factor is the proximate cause element of a negligence action considered on the macroscale of policy. Consideration is given to whether, across the universe of cases of the type presented, there would ordinarily be so little connection between breach of the duty contended for, and the allegedly resulting harm, that a court would simply foreclose liability by holding that there is no duty. The defendants in the instant matter argue the closeness of connection factor from two aspects, superseding cause and remoteness.

The defendants say that the law considers suicide to be "a deliberate, intentional and intervening act which precludes a finding that a given defendant is responsible for the harm." Brief of Appellees at 6. Defendants cite *McLaughlin v. Sullivan*, 123 N.H. at 339, 461 A.2d at 125, where the court held that an attorney's alleged malpractice, in not requesting a stay of sentence or bail pending appeal in a criminal case, could not have been the proximate cause of the client's suicide in jail during the first day of confinement following conviction. Here, however, we deal with the

relationship between an adolescent and school counselors who allegedly were informed that the adolescent was suicidal. Legally to categorize all suicides by adolescents as knowing and voluntary acts which insulate the death, as a matter of law, from all other acts or omissions which might operate, in fact, as causes of the death is contrary to the policy manifested by the Act. The Act does not view these troubled children as standing independently, to live or die on their own. In a failure to prevent suicide case, Maryland tort law should not treat an adolescent's committing suicide as a superseding cause when the entire premise of the Act is that others, including the schools, have the potential to intervene effectively.[6]

The defendants also argue that "[i]n blaming the Board and the school counselors for his daughter's death, [Eisel], at most, makes out a case for a remote cause, one which is speculative and inconclusive." We have held, *supra*, Part I, that this issue of causation in fact is not before us on this appeal. Obviously, when the factual skeleton, on which the duty issue has been presented to us, has been fleshed out with evidence at trial, causation may be a question for the jury, or it may develop that, as a matter of law, any causal connection has been severed by some fact, other than that death was essentially self-inflicted.

### D. Moral Blame

Moral blame as a factor to be weighed in deciding whether to recognize a legal duty in tort is less than an intent to cause harm. This factor considers the reaction of persons

---

**6.** The bill file on the Act reflects that the General Assembly had before it, *inter alia,* a publication of the State of Maryland Office for Children and Youth devoted entirely to youth suicide. In rejecting the "myth" that children do not commit suicide, the publication presents the following as "fact":

"Children from the age of 3 years can understand the concept of suicide and *do* kill themselves. The danger is that while they may understand the concept of suicide, they may not understand the finality of death until the age of 10–15 years."

3 Maryland Office for Children and Youth, *Monthly Memo,* at 3 (Apr.1986).

in general to the circumstances. Is it the sense of the community that an obligation exists under the circumstances? Certainly if classmates of Nicole found her lying on the floor of a lavatory, bleeding from slashed wrists, and those students told one or more teachers of the emergency, society would be outraged if the teachers did nothing and Nicole bled to death. Here, the information allegedly received by the counselors involved intent, not a description of physical facts. The distinction does not form a bright line separating duty from the absence of duty. The youth suicide prevention programs provided for by the Act call for awareness of, and response to, emotional warning signs, thus evidencing a community sense that there should be intervention based on emotional indicia of suicide.

## E.   Burden on the Defendant

"[U]nintended harms are ordinarily compensable if caused by conduct that involves undue risks—risks that, along with other costs, outweigh the usefulness of the conduct causing the harms." *Prosser & Keeton on The Law of Torts* § 85, at 608 (5th ed. 1984) (footnote omitted).

The harm that may result from a school counselor's failure to intervene appropriately when a child threatens suicide is total and irreversible for the child, and severe for the child's family. It may be that the risk of any particular suicide is remote if statistically quantified in relation to all of the reports of suicidal talk that are received by school counselors. We do not know. But the consequence of the risk is so great that even a relatively remote possibility of a suicide may be enough to establish duty. We pointed out in *Jacques v. First Nat'l Bank*, 307 Md. 527, 537, 515 A.2d 756, 761 (1986), that "[a]s the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury." *See Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 35 & n. 5, 517 A.2d 336, 345 & n. 5 (1986) (recognizing a duty against architects,

enforceable by recovery for economic loss, if building conditions present a clear risk of death or personal injury).

Moreover, when the risk of death to a child is balanced against the burden sought to be imposed on the counselors, the scales tip overwhelmingly in favor of duty. Certainly the physical component of the burden on the counselors was slight. Eisel claims only that a telephone call, communicating information known to the counselors, would have discharged that duty here. We agree.

The counselors argue that there are elements of confidentiality and discretion in their relationships with students that would be destroyed by the imposition of a duty to notify parents of all reports of suicidal statements. Confidentiality does not bar the duty, given that the school policy explicitly disavows confidentiality when suicide is the concern.

The defendants further point out that counselors are required to exercise discretion when dealing with students. Their discretion, however, cannot be boundless when determining whether to treat a student as a potential suicide. Discretion is relevant to whether the standard of conduct has been breached under the circumstances of a given case. Discretion does not create an absolute immunity, which would be the effect of denying any duty.

F. Community Consequences of Liability—Insurability

EA § 4–105(d) and Md.Code (1974, 1989 Repl.Vol., 1991 Cum.Supp.), § 5–353(b) of the Courts and Judicial Proceedings Article (CJ) allow a county board of education to "raise the defense of sovereign immunity to any amount claimed above the limit of its insurance policy or, if self-insured or a member of a pool ... above $100,000." [7] The Board participates in the Montgomery County self-insurance program.

---

7. We refer to statutes enacted after the occurrence involved in the action before us because the issue is whether to recognize a duty in tort, and the most recent statutes represent the best guide to the future. We intimate no opinion on the precise statutes which might govern coverage in the instant matter.

CJ § 5–353(e) provides that a "county board employee acting within the scope of employment, without malice and gross negligence, is not individually liable for damages resulting from a tortious act or omission for which a limitation of liability is provided ... under subsection (b)." [8] Recognizing the duty contended for by Eisel in this case would not appear to have any substantial adverse impact on this legislative scheme, or on the community at large.

## V

The Centers for Disease Control (CDC) in Atlanta has reported on a new survey of high school students, which revealed that twenty-seven percent "thought seriously" about suicide in the preceding year, and "one in 12 said they had actually tried." *The Sun* (Baltimore), Sept. 20, 1991, at 3A, col. 3. The CDC report noted that suicide rates among teenagers between fifteen and nineteen years old had quadrupled between 1950 and 1988. The General Assembly had similar numbers before it when it adopted the Act. "Changing social conditions lead constantly to the recognition of new duties." *Prosser & Keeton on The Law of Torts* § 53, at 359 (5th ed. 1984) (footnote omitted); *see, e.g., B.N. v. K.K.*, 312 Md. 135, 538 A.2d 1175 (1988) (transmission of herpes).

Considering the growth of this tragic social problem in the light of the factors discussed above, we hold that school counselors have a duty to use reasonable means to attempt to prevent a suicide when they are on notice of a child or adolescent student's suicidal intent. On the facts of this case as developed to date, a trier of fact could conclude that that duty included warning Eisel of the danger.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AND CASE REMAND-

---

**8.** At the hearing on the motion for summary judgment in this action, the circuit court also ruled that there were no allegations of malice or gross negligence on the part of Jones or Morgan. Eisel did not seek leave to amend; nor does he question those rulings on this appeal.

ED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEE, BOARD OF EDUCATION OF MONTGOMERY COUNTY, MARYLAND.

MURPHY, Chief Judge, concurring in the result.

The Court's reversal of summary judgment for the defendant is grounded on the allegations of the amended complaint and other evidence of record favorable to the plaintiff's claim. The Court's mandate remands the case "for further proceedings", ostensibly including the possibility of another summary judgment motion based on further evidentiary material developed in the summary judgment process by the defendant. As it now stands, however, I concur only in the result reached by the Court, and not in what I perceive may be an overly broad general explication of the principles governing application of the "duty" component in negligence actions, beyond that which is necessary to the decision in this case.

Judge CHASANOW has authorized me to state that he joins in this opinion.