Linda ROGERS and Frederick, Rogers, Husband and Wife, Individually, and as Administrators of the Estate of Roger L. Ellerbe, Jr., a minor; and Roger L. Ellerbe, Sr., Individually, Plaintiffs Below–Appellants,

v.

The CHRISTINA SCHOOL DISTRICT, an agency of the State of Delaware, Dr. Marcia V. Lyles, Individually and in her capacity as Superintendent, Curtis Bedford, Individually and in his capacity as Principal of Newark High School; Margette Finney, Individually, Holistic Family Services, Individually, Defendants Below–Appellees.

No. 45, 2012.

Supreme Court of Delaware.

Submitted: April 18, 2013.
Decided: July 16, 2013.

Stephen B. Potter, Esquire, and Tiffany M. Shrenk, Esquire (argued), of Potter, Carmine & Associates, P.A., Wilmington, Delaware, for Appellants Linda Rogers, Frederick Rogers, Roger L. Ellerbe, Jr., and Roger L. Ellerbe, Sr.

Marc S. Casarino, Esquire (argued), and Sean A. Meluney, Esquire, of White and Williams, LLP, Wilmington, Delaware, for Appellees The Christina School District, Dr. Marcia V. Lyles and Curtis Bedford.

Gilbert F. Shelsby, Jr., Esquire, of Shelsby & Leoni, Wilmington, Delaware, for Appellees Margette Finney and Holistic Family Services.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en Banc.

RIDGELY, Justice:

A sixteen-year-old student at Newark High School explained in writing to a school counselor that, while at school the day before, he wanted to hurt himself and others and that he was feeling alone and unloved. He admitted to the counselor that he had actually attempted suicide just two days earlier.

After four hours with the student, the counselor decided the student was no longer suicidal and sent him back to class. She explained in an e-mail to his teachers, the Assistant Principal, and other school counselors that she had met with the student and did not believe he was a threat to himself. State Department of Education and School District regulations require a parent or guardian to be notified of a crisis

situation involving a student. A crisis situation includes suicidal or homicidal statements or actions. The school did not notify the student's parent or guardian. After the student went home, he hanged himself.

The student's family and the administrators of his estate brought this wrongful death and survival action against the school district, the superintendent, the high school, its principal, and the school counselor (collectively, as defendants, "School"). The Superior Court granted summary judgment in favor of the defendants, finding no duty to the student and no wrongful act under the Delaware Wrongful Death Statute. The plaintiffs have appealed, asserting common law duties based upon the existence of a special relationship between a school and its students. In response to an inquiry from this Court, the plaintiffs also assert negligence *per se* based upon Defendants' violation of the school district regulations.

We find no merit to the appeal except for the negligence *per se* claim. The alleged violations of the State Department of Education's and the School District's mandatory requirements to notify a parent or guardian of the student's crisis situation state a claim of negligence *per se*. The regulations were enacted for the safety of others and have the force and effect of law.

Accordingly, the judgment of the Superior Court is reversed and this matter is remanded for further proceedings.

### *Facts and Procedural History*

On November 2, 2009, Aigner Walker, a friend of Roger "Mac" Ellerbe, informed Newark High School teacher Robert Newman that a friend was having problems and was contemplating suicide. Newman reported this conversation to Margette Finney, the School's Intervention Specialist. Finney is the owner and sole employee of Holistic Family Services, LLC, which was under contract with the School District to offer services to the School as a behavior interventionist.

The next day, Finney met with Walker to learn the identity of the student in question. Walker informed her that Ellerbe was considering committing suicide and that he had tried to suffocate himself the previous weekend. Finney then located Ellerbe and called him into her office. Ellerbe confirmed that he had attempted suicide the previous weekend.

Finney then called Marlyna Melendez, Ellerbe's former girlfriend and classmate. Finney talked to Melendez about her relationship with Ellerbe and Finney informed her that Ellerbe was contemplating suicide. After gathering information from Melendez, Finney instructed her to return to class.

With just Ellerbe in her office, Finney began to counsel Ellerbe, asking him to write down everything he was feeling at the time. Ellerbe wrote that when he came to school the day before he had a desire to hurt himself and others, and that he felt alone. Finney talked with Ellerbe for over four hours. Finney noticed, over that time, that Ellerbe's mood and demeanor were improving. Finney asked Ellerbe to again write down what he was feeling. This time Ellerbe explained that he was feeling better and that he was ready for school. Finney then sent Ellerbe back to class.

Following this conversation, Finney emailed Ellerbe's teachers, the Assistant Principal, and other school counselors informing them of her conversation with Ellerbe. The e-mail states:

Good Morning Everyone,

After talking with Roger Ellerbe in great detail I feel that he is not a threat to himself. Roger was having a bad day yesterday with build [sic] up anxiety

from home and girl friend issues. His girl friend broke up with him on Sunday he couldn't handle what was happening to him leading to him thinking that no one cares about him.... When Roger got home from school he sat his Grandmother down who's his guardian talking things out with her and reconciling his different [sic] with girl friend [sic] thus making up. I got Roger and Marlyna Melenndez [sic] (girls [sic] friend) together to talk about their relationship and will call Grandmother letting her know what's going on. I also gave Roger a packet for the wellness center to get filled out and return [sic] back to me. Roger agreed to come to me, Mr. Newman or the wellness center if he has any concerns. I had Roger write a statement as to how he was feeling yesterday and today. Aigner Walker was the student who brought this to our attention she also wrote a statement on what she observed yesterday. If anyone [sic] of you think we should do anything else please let me know.

Keeping you all informed!

Mrs. Finney [1]

There is no indication in the record that Finney contacted Ellerbe's grandmother or took any additional action. Finney has no training in adolescent psychology, teenage depression, or adolescent suicide. Finney was unaware of the School District's established protocol for how to deal with a student in crisis.

After school, Ellerbe returned home. He spoke with his grandmother, Linda Rogers. He did not tell Rogers about his suicidal thoughts and Rogers did not notice any signs of depression in Ellerbe. That evening, Ellerbe hanged himself in the basement of the Rogers' home.

After these events, wrongful death claim was filed under the Delaware Wrongful Death Statute,[2] and the School filed a Motion to Dismiss under Superior Court Rule 12(b)(6). The Superior Court converted the Motion to one for Summary Judgment pursuant to Superior Court Civil Rule 56 since it was necessary to consider matters outside of the pleadings.

The Superior Court granted the School's motion for summary judgment, finding no duty to the student and no wrongful act because there was no special relationship between Ellerbe and the School.[3] This appeal followed.

### Discussion

We review a grant of summary judgment *de novo*.[4]

In order for Rogers to recover damages under the Delaware Wrongful Death Statute,[5] Rogers must show that the School was negligent. "Negligent behavior is usually defined as the failure to meet the standard of care which the law re-

---

1. Appendix to Appellee's Answering Brief at B65.

2. 10 *Del. C.* §§ 3721–25.

3. *Rogers v. Christina School Dist.*, 2012 WL 1415623, at *6 (Del.Super., Jan. 18, 2012).

4. *Asbestos Workers Local Union No. 42 Welfare Fund v. Brewster*, 940 A.2d 935, 940 (Del. 2007) (citing *Wilmington Trust Co. v. Aetna Cas. & Sur. Co.*, 690 A.2d 914, 916 (Del. 1996)).

5. 10 *Del. C.* § 3721(5) (stating that "[w]rongful act" means "an act, neglect or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued"); *id.* § 3722(c) ("If a person whose wrongful act caused the death of another dies before an action under this section is commenced, the action may be maintained against a personal representative.").

quires. However, liability for negligence is limited by the scope of the legally defined duty."[6] Therefore, before liability may be imposed, "an antecedent duty of care with respect to the interest involved must be established."[7] The issue of whether a school district can be liable for the suicide of a student committed off of the school's property is an issue of first impression in Delaware.

■ "Generally, to determine whether one party owed another a duty of care, we follow the guidance of the Restatement (Second) of Torts."[8] Section 282 of the Restatement (Second) defines negligence as "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm," not including "conduct recklessly disregardful of an interest of others."[9] Section 284 states:

■ Negligent conduct may be either:
(a) an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, or
(b) a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do.[10]

■ Section 302 further explains that:
A negligent act or omission may be one which involves an unreasonable risk of harm to another through either:

(a) the continuous operation of a force started or continued by the act or omission, or
(b) the foreseeable action of the other, a third person, an animal, or a force of nature.[11]

■ Comment (a) to Section 302 states that there are dissimilar duties owed by "one who merely omits to act" versus one "who does an affirmative act."[12] Comment (a) explains that "anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act."[13] But, "one who merely omits to act" generally has no duty to act, *unless* "there is a special relation between the actor and the other which gives rise to the duty."[14]

■ Section 314 discusses "the early common law distinction between action and inaction, or 'misfeasance' and 'nonfeasance.'"[15] Section 314 states that, "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."[16] There are exceptions to this rule. Section 314A explains that common carriers, innkeepers, possessors of land, and those "required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for pro-

6. *Furek v. Univ. of Delaware*, 594 A.2d 506, 516 (Del.1991).

7. *Id.* (*citing* 5 F. Harper et al., *The Law of Torts*, § 18. 1, at 650 (2d ed. 1986)).

8. *Riedel v. ICI Americas Inc.*, 968 A.2d 17, 20 (Del.2009).

9. Restatement (Second) of Torts § 282 (1965).

10. *Id.* at § 284.

11. *Id.* at § 302.

12. *Id.* at § 302 cmt. a.

13. *Id.*

14. *Id.*

15. *Id.* at § 314 cmt. c.

16. *Id.* at § 314.

tection is under a similar duty to the other" may have a special duty to aid and protect another which can include non-feasance.[17] Such a duty to act is also extended in parent-child relationships and to those who have custody of another.[18]

Based on the traditional common law, "liability for non-feasance was slow to receive any recognition in the law." [19] Generally, the duty to act is "largely confined to [ ] situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff." [20] The Rogers argue that the School owed both misfeasance and non-feasance duties of care to Ellerbe.

### The Rogers' Claims of Misfeasance Were Not Properly Raised

In their Reply Brief, the Rogers raise several arguments accusing the School of misfeasance. Under Delaware Supreme Court Rule 14, an appellant must raise and argue claims of error in both the Summary of Argument and the Argument portions of his Opening Brief.[21] This Court will not entertain arguments presented only in the Reply Brief.[22] Accordingly, the Rogers' misfeasance claims are deemed waived.

### The Rogers' Negligence Claims

The Rogers concede that the failure to act by the School generally would not impose liability without falling into one of the exceptions to Section 314 of the Restatement (Second). To overcome this hurdle, the Rogers offer two theories: (1) that the School assumed a duty of care; and (2) that a special relationship existed between the School and Ellerbe requiring the School to notify Ellerbe's guardians. We find no merit to either theory, and accordingly find that in this situation, the School did not owe Ellerbe a duty of care.

### The School Did Not Assume a Duty of Care

Section 323 of the Restatement (Second) of Torts states the requirements for an assumed duty of care:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.[23]

In *Jardel Co., Inc. v. Hughes*, we held that a shopping mall owner could be liable for injuries sustained by a tenant's employee who was abducted in the mall parking lot and raped at a nearby location.[24]

---

17. *Id.* at §§ 314A, 302 cmt. a.

18. *Id.* at §§ 316–320.

19. *Riedel v. ICI Americas Inc.*, 968 A.2d 17, 23 (Del.2009).

20. *Id.*

21. Del. Sup.Ct. R. 14(b)(iv), (vi); *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 (Del.2004) (holding that the appellant must both raise an issue in the Summary of the Argument and pursue it in the Argument portion of the brief).

22. Del. Sup.Ct. R. 14(c)(i).

23. Restatement (Second) of Torts § 323 (1965).

24. *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 524 (Del.1987).

"Having undertaken to provide a security program, albeit voluntarily, [the mall owner] was obligated to perform the task in a reasonable manner with a view toward the dangers to which the program was directed."[25] "The crucial inquiry is the extent of the danger which a landlord must reasonably foresee."[26]

In *Furek v. University of Delaware* we held that a university could be held liable for injuries sustained by a student in a fraternity hazing incident which occurred on university property.[27] In that case, the university was aware of the dangers of hazing and repeatedly emphasized its policy of discipline for hazing infractions, but did nothing to intervene or prevent the hazing incident.[28] "The university is not an insurer of the safety of its students nor a policeman of student morality, nonetheless, it has a duty to regulate and supervise foreseeable dangerous activities *occurring on its* property."[29] As we later noted in *Marshall v. University of Delaware*, "[i]n *Furek* the circumstances supported a claim under … § 323 and under a landlord-invitee relationship."[30]

Section 323 only addresses the duty of care to a person physically on the property of the entity owing the duty. In both *Jardel* and *Furek*, liability could be imposed because the injury from a reasonably foreseeable harm occurred *on the defendants' property.* Here it is conceded that the injury occurred off of school grounds. Section 323 is inapplicable.

This conclusion is consistent with *Jain v. State*, a decision of the Iowa Supreme Court interpreting § 323. In that case, the University of Iowa had "an unwritten university policy dealing with self-destructive behavior" that dictated "that, with evidence of a suicide attempt," university officials will contact a student's parents.[31] A student revealed to a Resident Advisor at the University that he "may have been at risk of harming himself."[32] The R.A. offered support and encouragement, and referred the student to a counselor, but at the student's request did not contact his parents.[33]

The Iowa Supreme Court analyzed the duty under Restatement Section 323. Under Restatement Section 323(a), however, "[n]o affirmative action by the defendant's employees … increased that risk of self-harm."[34] The Court found that "no action by university personnel prevented [the student] from taking advantage of the help and encouragement being offered, nor did they do anything to prevent him from seeking help on his own accord." Analyzing the reliance element of Restatement Section 323(b), the Court found that the record was "similarly devoid of any proof that [the student] relied, to his detriment, on the services gratuitously offered by these same personnel."[35] Instead, the Court found that the student "failed to

25. *Id.*

26. *Id.*

27. *Furek v. Univ. of Delaware*, 594 A.2d 506, 520 (Del.1991)

28. *Id.* at 514.

29. *Id.* at 522 (emphasis added).

30. *Marshall v. Univ. of Delaware*, 633 A.2d 370, 1993 WL 385114, at *1 (Del.1993).

31. *Jain v. State*, 617 N.W.2d 293, 296 (Iowa 2000).

32. *Id.* at 299.

33. *Id.* at 296.

34. *Id.* at 299.

35. *Id.*

follow up on recommended counseling or seek the guidance of his parents, as he assured the staff he would do." [36] The Iowa Supreme Court ultimately held that "the university's limited intervention in this case neither increased the risk that [the student] would commit suicide nor led him to abandon other avenues of relief from his distress. Thus no legal duty on the part of the university arose under Restatement [S]ection 323 as a matter of law." [37]

*Jain* is similar to this case. Here, the School adopted a Protocol for how to handle students who express some suicidal intent. Finney took no "affirmative action . . . [which] increased the risk of self-harm." [38] She spoke at length with Ellerbe, counseled him, took note of how he was feeling and then alerted other school personnel. Consistent with our decision in *Furek* and the Iowa Supreme Court decision in *Jain*, the School did not assume a general duty of care to Ellerbe.

### The School Did Not Have a Special Relationship to Ellerbe

 In *State v. Baccino*, the Superior Court explained that under Delaware law a school official "stands *in loco parentis* to pupils under his charge for disciplinary action, at least for purposes which are consistent with the need to maintain an effective educational atmosphere." [39] We

have explained that this doctrine is limited in application "to claims against high school authorities for injuries to students arising out of a failure to supervise." [40] There is no Delaware precedent suggesting that *in loco parentis* should be applied to an injury sustained by a high school student not inflicted by another student, or, as the Rogers urge, instances where a school administrator fails to alert medical professionals or the student's guardians. Rather, much of the case law involves instances where the school administrator conducts a search of a student's property or disciplines a student. [41] Therefore, the doctrine of *in loco parentis* does not create a special relationship between the School and Ellerbe under the facts of this case.

 Section 314A of the Restatement attaches a legal duty to parties when they assume custody of another and imposes liability for further aggravating an injury. Specifically, Section 314A explains that certain situations can give rise to special relationship imposing a duty to aid or protect another. As subsection (4) illustrates, "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." [42]

36. *Id.* at 299–300.

37. *Id.* at 300.

38. *Id.* at 299.

39. *State v. Baccino*, 282 A.2d 869, 871 (Del.Super.1971) (*citing* 14 *Del. C.* § 701 (1970)). http://www.merriam-webster.com/dictionary/in%20loco%20parentis (last visited July 25, 2012).

40. *Furek v. Univ. of Delaware*, 594 A.2d 506, 517 (Del.1991) (*citing Rupp v. Bryant*, 417 So.2d 658, 666–67 (Fla.1982)).

41. *See e.g., Baccino*, 282 A.2d at 872 (school administrator search); *Rupp*, 417 So.2d at 668 (teacher's failure to supervise led to injury); *see Wisch v. Sanford Sch., Inc.*, 420 F.Supp. 1310, 1317 (D.Del.1976) ("*In loco parentis* is a doctrine usually invoked by the schools as a source of disciplinary authority.").

42. Restatement (Second) of Torts § 314A (1965).

As the comments note, "this Section appl[ies] only where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation."[43] This harm is not limited to circumstances solely inflicted by the defendant, but can extend to cases "where the illness or injury is due to natural causes, to pure accident, to the acts of third persons, or to the negligence of the plaintiff himself."[44] Nonetheless, "[t]he duty ... is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury."[45] The Rogers cite to one illustration provided in the Restatement:

A is a small child sent by his parents for the day to B's kindergarten. In the course of the day A becomes ill with scarlet fever. Although recognizing that A is seriously ill, B does nothing to obtain medical assistance, or to take the child home or remove him to a place where help can be obtained. As a result, A's illness is aggravated in a manner which proper medical attention would have avoided. B is subject to liability to A for the aggravation of his injuries.[46]

Section 314A only applies to situations requiring assistance where the injured party is in the custody of the defendant. Since Ellerbe's suicide took place while he was at home and not on school grounds, the School no longer had custody and Section 314A does not apply.

Section 315 of the Restatement is a catch-all provision for establishing a legal duty of care. It states:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.[47]

In order to find a duty based on Section 315, there must first be a special relationship between the School and Ellerbe. As previously discussed, no such special relationship existed between the School and Ellerbe. Here, as in *Furek*, there is no duty requiring a university to protect its adult students "based *merely* on the university-student relationship."[48]

There have been only a few other jurisdictions that have addressed a high-school student's suicide and resulting tort liability. In *Eisel v. Board of Education of Montgomery County*, the Court of Appeals of Maryland held that school counselors have a duty to use reasonable means to attempt to prevent suicide when they are on notice of a child or adolescent student's suicidal intent.[49] In *Eisel*, a thirteen-year old girl entered into a murder-suicide pact, of which the school came to learn.[50] The school counselor questioned the student

---

43. *Id.* at § 314A cmt. c.

44. *Id.* at cmt. d.

45. *Id.* at cmt. e.

46. *Id.* at cmt. f, illus. 7.

47. Restatement (Second) of Torts § 315 (1965).

48. *Furek*, 594 A.2d at 519 (emphasis in original).

49. *Eisel v. Bd. of Educ. of Montgomery Cnty.*, 324 Md. 376, 597 A.2d 447, 452–53 (1991).

50. *Id.* at 449.

about the pact but the student denied it.[51] The school did not alert the parents of the student. A week later the student completed the murder-suicide pact off school grounds. The court in *Eisel* explained:

> The harm that may result from a school counselor's failure to intervene appropriately when a child threatens suicide is total and irreversible for the child, and severe for the child's family. It may be that the risk of any particular suicide is remote if statistically quantified in relation to all of the reports of suicidal talk that are received by school counselors. We do not know. But the consequence of the risk is so great that even a relatively remote possibility of a suicide may be enough to establish duty.[52]

The court further explained that "[f]oreseeability is the most important variable in the duty calculus."[53] Thus, it is up to the jury to determine whether the risk of suicide was reasonably foreseeable enough for the duty to arise.[54] Although the court in *Eisel* relied on acts of the Maryland General Assembly and Department of Education policies to reduce youth suicides, the court still created a new a common law duty as a matter of law.[55]

*Eisel* is easily distinguished from this case, as Maryland common law has long placed schools *in loco parentis* with students.[56] In contrast, Delaware courts have only found an *in loco parentis* relationship between a school and a student "for the purposes which are consistent with the need to maintain an effective educational atmosphere."[57]

### Negligence Per Se

The Christina School District has "Guidelines for Handling of Student Suicidal Ideation." Section 5.2 (Responsibilities for Handling and Reporting of Student Suicidal Ideation) includes the following mandate:

> 5.2.1.1: The school counselor, school nurse, or school psychologist shall follow the procedures outlined on the Crisis Intervention Procedures for Suicide Threats quick reference sheet.

The "Quick Referral Reference" sheet lists a Protocol that must be followed when a student expresses suicidal inclinations. This Protocol requires that the counselor "(1) Stay with Student, (2) Assess Situation, (3) Contact Parent, (4) Get Help, (5) Document and File, and (6) Follow-up."[58]

The Guidelines were created in direct response to State Department of Education ("DOE") Regulation 621 which mandates the following:

> 1.0 Definitions:
>
> "Emergency Preparedness Guidelines" means the Department of Education developed documents that outline the steps, processes, procedures, audits and actions a school, local school district or charter school shall use to develop a plan to respond to an emergency event or crisis situation, including a major

---

51. *Id.*

52. *Id* at 455.

53. *Id* at 452.

54. *Eisel,* 597 A.2d at 449.

55. *Id.* at 453–54.

56. *Id.* at 451–52 (*citing Segerman v. Jones,* 256 Md. 109, 123–24, 259 A.2d 794, 801 (1969); *Lunsford v. Board of Educ.,* 280 Md. 665, 374 A.2d 1162, 1168 (1977)).

57. *State v. Baccino,* 282 A.2d 869, 871 (Del.Super.1971); *Wisch v. Sanford School,* 420 F.Supp. 1310, 1317 (D.Del.1976).

58. Christina School District: Crisis Intervention Procedures for Suicide Threats; Appendix to Appellant's Opening Brief at A172–174.

communicable disease event such as a Pandemic Influenza Outbreak that may occur in the school community. These documents may be revised from time to time. The documents shall be available on the Department of Education website.

2.0 District and Charter School Written Policy Required

2.1 Each school district and charter school shall have a written policy that outlines an emergency preparedness plan that is consistent with the Emergency Preparedness Guidelines. In addition, the district policy shall state how the emergency preparedness plan shall be implemented at each school within the district. The emergency preparedness plan shall be reviewed with students and staff annually.

Based upon regulation 621, the DOE has designed a "Quick Referral Reference" guide on its website. Under this protocol, the following actions are to be taken in a "crisis" situation:

1) The child is clearly dangerous to themselves or someone else (EX: suicidal or homicidal statements or actions; *not* tantrums or behavioral issues)

2) Contact parents or guardians immediately. Assessment is only possible in very rare cases without consent of the legal caretaker.

3) While speaking to parents, ask what sort of insurance they have. If Medical Assistance, CPR can be contacted for assessment, however they can NOT transport a child to the hospital nor can they restrain an out of control child. 4) If the parents or guardians can not be reached, you may contact the police to take custody and transport the child to a local emergency room for assessment.

6) Refer to Crisis FAQ for additional questions or contact DCMHS intake at 633–2600 between the hours of 8 a.m.–4:30 p.m.[59]

 The DOE has the authority to establish policies it deems necessary for the administration and operation of the State's public education system.[60] The DOE's regulation establishes "Emergency Preparedness Guidelines" and mandates that each school district in the State have written policies consistent with these guidelines.[61] The School, in an attempt to show it did not voluntarily assume a special duty to Ellerbe, states that it only implemented the Protocols in reaction to a regulatory requirement from the State Department of Education. The Superintendent of Christina School District testified in deposition that the Protocol was implemented in response to this DOE mandate.[62] School districts are merely "geographic subdivisions of the State organized for the purpose of administering public education in that area," and defiance of a DOE mandated policy may result in budget cuts for a school.[63]

In *Sammons v. Ridgeway*, we considered whether violations of regulations promulgated by the State Board of Education would constitute negligence *per se*.[64] In

---

59. *http://www.doe.k12.de.us/infosuites/staff/cmh/tools/protocols/sub2.shtml* (emphasis in original).

60. 14 *Del. C.* § 103(a)(7).

61. 14 *Del. Admin. C.* § 621(1.0), (2.1).

62. Marcia Lyles Deposition, May 16, 2012, at 14–17; Appellee's Answering Supplemental

Memoranda Addressing the Issues in the Court's Letter Dated March 7, 2013, Ex. F.

63. 14 *Del. C.* §§ 1002(d); 1702(b).

64. *Sammons v. Ridgeway*, 293 A.2d 547, 548 (Del.1972).

*Sammons*, a minor student was injured when getting off of a school bus. The student's family brought suit alleging the driver violated safety standards, which required students to cross a certain distance from the front of the bus to allow other drivers to see the students.[65] Because State Board of Education regulations have the force of law and violations of state laws and ordinances enacted for the safety of others is negligence *per se*, the Court found violations of Board of Education regulations promulgated for safety purposes constituted *negligence per se.*[66]

The regulation at issue in *Sammons* was adopted pursuant to 14 *Del. C.* § 2901, which provided that:

> The State Board of Education, by and with the advice of the Motor Vehicle Commissioner, shall adopt and enforce regulations not inconsistent with the motor vehicle laws of this State to govern the design and operation of all school busses used for the transportation of school children, whether such busses be owned and operated by any public school district or privately owned and operated under contract with the State Board or any public school district in this State. Such regulations shall by reference be made a part of every contract entered into by the State Board or any school district for the operation of a school bus. Every school district, its officers and employees, and every person employed under contract by the State Board or a school district to furnish or operate a school bus shall be subject to the regulations.[67]

Pursuant to that mandate, the Board of Education promulgated regulations which included the following:

> (9) Pupils who must cross the road to board the school bus or after leaving the bus shall cross approximately ten feet in front of the bus and only upon the signal given by the driver.
>
> (10) It is safer for pupils to cross at a minimum of ten feet in front of the bus. (The driver is required by law to actuate the flashing red lights when the bus is stopped to receive or discharge pupils.) Traffic immediately approaching or following the bus should be permitted to pass before the lights are actuated.[68]

In *Joseph v. Monroe*, we distinguished *Sammons* and found the statute insufficient to trigger negligence *per se*. In that case, a sixth grade student was injured on the playground during supervised recess.[69] The operative statute at issue was 14 *Del. C.* § 1049, which required the school district Board of Education to issue rules and regulations regarding the "conduct and management" of the school. It read, in relevant part:

> The school board of each reorganized school district, subject to this title and in accordance with the policies, rules and regulations of the State Board of Education, shall, in addition to other duties:
>
> (1) Determine the educational policies of the reorganized school district and prescribe rules and regulations for the conduct and management of the schools;
>
> (2) Enforce the provisions of this title relating to school attendance;
>
> (3) Grade and standardize all the public schools under its jurisdiction and may

---

65. *Id.* at 549.

66. *Id.* at 549–50.

67. *Id.* at 548 n. 1.

68. *Id.* at 549.

69. *Joseph v. Monroe*, 419 A.2d 927, 929 (Del. 1980).

establish kindergartens and playgrounds and such other types of schools, as in its judgment will promote he educational interest of the reorganized school district;

(4) Adopt courses of study;

(5) Select, purchase, and distribute free of charge such textbooks and other materials of instruction, stationery, furniture, equipment, apparatus and supplies as are necessary to the work of the schools;

(6) Provide forms on which regular school employees shall make such reports as may be required by the school board;

(7) Make all reports required by the State Superintendent of Public Instruction, at such time, upon such items and in such form as may be prescribed by the State Superintendent;

(8) Appoint personnel.[70]

Based on the above delegation, the school district promulgated the following provisions, compiled in the Teacher's Handbook:

10. Playground: Playground rules should be enforced in such way as to make the area pleasant and safe. Staff members on playground duty are to be aware of what is happening on the playground at all times. Students who create problems on the playground should be reported to the Principal for disciplinary action. Any injuries should be reported immediately to the nurse or, in her absence, to the office.

The Following Comments Might Also Be Helpful:

a. Teachers should plan varied activities for students on the playground, when possible.

b. Activities which are unsafe and annoying to others should be stopped and time should be taken to organize a worthwhile and safe activity.

c. Students are not to enter the building during recess without the permission of a staff member on duty.

d. Students should know the proper use of any equipment made available to them on the playground.[71]

The *Joseph* plaintiffs argued that the teacher supervising recess ignored the handbook's guidelines, and therefore, under *Sammons*, committed negligence *per se*.

We found *Sammons* was distinguishable from the facts of *Joseph*. In *Joseph*, we found the authorizing statute was insufficiently specific, the actual rule/regulation promulgated was insufficiently specific, and the statute did not include any civil or criminal penalties. Here, the School argues that the statute at issue is similarly nonspecific, and the Protocols contain no penalty for noncompliance, making this case more like *Joseph* than *Sammons*.

■ We said in *Sammons*, "regulations of the State Board of Education have the force of law. . . . This conclusion is especially impelled when, as here, the Board's regulations are mandated, and the legislative power is delegated, by statute explicitly."[72] The operative statute in *Sammons* required the DOE to adopt standards regulating the bussing of students to ensure safety. Here, the General Assembly has similarly required that the DOE prescribe rules and regulations "governing the phys-

---

70. *Id.* at 931 n. 3 (*citing* 14 *Del. C.* § 1049).

71. *Id.* at 929 n. 1 (*citing* Sussex Central Elementary School, Indian River School District Teacher's Handbook 1977–78, at 8).

72. *Sammons,* 293 A.2d at 549.

ical inspection of and the protection of the health and physical welfare of public school students in the State."[73] The DOE regulations and website protocols require schools to adopt and publish specific plans to deal with students who have suicidal intentions, and include a requirement to contact a parent or guardian immediately when a child "is clearly dangerous to themselves." The example given is "suicidal or homicidal statements or actions." The statute and regulation here has the requisite specificity to establish negligence *per se* under *Sammons*.

 As to the lack of a penalty for noncompliance with the DOE regulations or the Christina Protocols, *Sammons* did not hold that the presence or lack of a penalty was dispositive. In this case, two of the three distinguishing features in the *Joseph* regulations are not present. The Restatement (Third) of Torts Section § 14, covering negligence *per se*, does not require a statute, ordinance or regulation to contain a penalty to trigger negligence *per se*.[74] "The basic concept of negligence *per se* is to ease the requirements of proving negligence if a party inflicts harm that the General Assembly attempted to alleviate by legislative enactment."[75] Given the purpose of the negligence *per se* doctrine, its application is not dependent upon a fixed penalty.

 The School is alleged to have violated its own and the DOE standards for responding to a student in crisis. The

Christina School District has also established procedures, in addition to the Protocol, for dealing with students displaying suicidal intentions. The procedures are set forth in a policy titled "Crisis Intervention Procedures for Suicide Threats." The procedures direct a counselor or psychologist to "stay with student, assess situation, contact parent, get help, document and file, follow-up." "It has been long settled in this State that the violation of a statute or ordinance enacted for the safety of others is negligence in law or negligence *per se*."[76] The Protocols, mandated by the DOE and promulgated pursuant to its statutory authority delegated by the General Assembly, have the force and effect of law. Under *Sammons*, the School's actions, if proved, establish negligence *per se*. The issue of whether the alleged violation was a proximate cause of Ellerbe's death is not before us.

### *Conclusion*

The Superior Court correctly found no special relationship existed between Ellerbe and the School and that the School did not voluntarily accept a duty of care. But, the Rogers have sufficiently pleaded facts to support a claim of negligence *per se* for the violations of the State Department of Education and the School District's mandatory requirements to notify a parent or guardian of Ellerbe's crisis situation. Accordingly, the judgment of the Superior Court is **REVERSED,** and this

---

73. 14 *Del. C.* 122(b)(2).

74. Restatement (Third) of Torts § 14 (2010). "An actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect." Comment (e) describes statutes that duplicate common law, and Comment (j) describes statutes and regulations inapplicable to the negligence *per se*

doctrine. These Comments discuss the requirements for a statute or regulation to fall within the negligence *per se* doctrine, but neither mentions a fixed penalty as a requirement.

75. *Fanean v. Rite Aid Corp.*, 984 A.2d 812, 824 (Del.Super.Ct.2009).

76. *Sammons*, 293 A.2d at 549.

matter is **REMANDED** for further proceedings consistent with this opinion.